IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CRAIG ELMER ("OWL") CHAPMAN, | ) ) | CIVIL NO.  07-00002 JMS/LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING IN PART AND |
| vs. | ) | DENYING IN PART DEFENDANTS' |
| | ) | MOTION FOR PARTIAL |
| JOURNAL CONCEPTS, INC., A | ) | SUMMARY JUDGMENT |
| CALIFORNIA CORPORATION, | ) | |
| d.b.a, THE SURFER'S JOURNAL; | ) | |
| JEFF JOHNSON; STEVE PEZMAN; | ) | |
| DEBBEE PEZMAN; DAN MILNOR; | ) | |
| SCOTT HULET; and JEFF DIVINE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.  INTRODUCTION

Craig "Owl" Chapman ("Plaintiff"), a surfer and surfboard craftsman,

sued *The Surfer's Journal*, author Jeff Johnson ("Johnson"), photographer Dan

Milnor ("Milnor"), editor Scott Hulet, photo editor Jeff Divine, and publishers

Steve and Debbee Pezman (collectively, "Defendants") over an August/September

2006 magazine issue in which Defendants published an article recounting

Johnson's pursuit of a custom-shaped single-fin surfboard, photographs, and other

surfers' recollections of Plaintiff.  The court finds that Plaintiff is a general public

figure within the surfing community and that his defamation and defamation-based

claims are governed by the actual malice standard set forth in *New York Times Co.*

*v. Sullivan*, 376 U.S. 254 (1964) and its progeny.  The court also finds that

Plaintiff's claims for invasion of privacy and misappropriation/unauthorized use of

his name and photograph in an unfavorable publication are not viable.  Finally, the

court declines to grant summary judgment on Plaintiff's false light claim.

## II.  BACKGROUND

### A.    Factual Background

Plaintiff is a surfer and surfboard shaper living on Oahu's North

Shore.  As described in The Encyclopedia of Surfing, Plaintiff became

> famous in the early and mid-70's for his tuberiding at Sunset
> Beach and Maalaea, and for his flamboyant "hood ornament
> stance" at Pipeline, where he'd race through the tube with arms
> spread and his right knee dropped to the deck of his board . . . .
> Craig -- nicknamed "Owl" as a play on his woeful
> nearsightedness -- soon became one of the most dedicated
> surfers on the North Shore . . . .  Chapman remained a part of
> the North Shore surf scene long after most all his
> contemporaries moved on, and became known for his zoned-
> out but epigrammatic phrasing.  "When I was 22," he said in
> 1985, "I had a Cadillac, ten surfboards, and ten girlfriends.
> Man, I thought it would be like that forever."  As journalist
> Mike Latronic later described it, Chapman "walks the fine line
> between profound philosopher and space-cadet."

Defs.' Ex. A at D00498-99.  Plaintiff dominated the surf breaks for many years.

As a 1985 article in *Surfing Magazine* observed,

> [o]f all the . . . surf cats who were early pioneers of
> performance surfing at big Sunset Beach and Waimea Bay,
> only Owl Chapman has persevered.  You could never take an
> ounce of respect away from legends like Jeff Hakman or Sam
> Hawk or any of those brave souls of fifteen years ago,
> venturing out to second reef Sunset, testing their equipment
> and state of mind; all of these men are brave heroes.  But who
> still lives there and surfs Sunset like an anxious zealot?  Craig
> "Owl" Chapman, the man time forgot.
>          . . .
> Here is a man who has been invited to seven or eight Duke
> Classics, surfed in the Smirnoff, Masters, Coke, Stubbies and
> Gunston contests and proven himself as one of the greatest big-
> wave riders in history, and at thirty-five still possesses the drive
> and initiative to rush into dribbling Laniakea to compete with
> some of the world's best small-wave competitors.

Defs.' Ex. C at D00517.

Revered as a daring and elite athlete who routinely surfed the island's

biggest and most dangerous wave breaks, Plaintiff was considered to be one of the

> North Shore's most committed surfers -- not the touring
> professionals or visiting superstars, but an elite group within
> that realm, the ones who live in Hawaii and base their entire
> existence around riding mountainous, terrifying surf . . . [and
> who] share the same qualities of presence and bravado in life-
> threatening conditions, and . . . possess a brand of intelligence
> that can only be drawn from the ocean.

Defs.' Ex. D at D00521; *see also* Defs.' Ex. H.  A "key figure" in surfing, Plaintiff

was

3

> fully legit in the water.  He's been out in more big swells than
> anyone his age . . . dodging, scratching, diving, styling and
> sensing waves before most. . . .
>     Owl made his mark with a style born of originality. . . .
> [H]e came away with some of the more memorable photos, and
> his signature move had as much panache as a goofyfoot's
> barrel.

Defs.' Ex. E at D00527-28.  Plaintiff's unique surfing style, innovative surfing

moves, and colorful personality have made him well-known.  Recalling some of

Plaintiff's "classic, anti-hero antics," an author for *Surfer* magazine writes, "I

knew Owl before I met him.  It seemed like all the best tales my mentor . . . used to

tell involved [Owl] in some bizarre manner."  *Id*. at D00527.  In short, Plaintiff is

exalted as "a living legend on the North Shore, a man who surfed second-reef

Pipeline backside when it was considered beyond the limits of good sense; a man

who has surfed big Sunset as much as anyone," and a surfer who "knew no fear."

Defs.' Ex. D at D00522, D00524.

Plaintiff turned his surfing talent into a business: surfboard shaping.

Surfboard designs may be customized by length, width, material, shape, rails, fins,

rocker, and lift to account for a surfer's height, weight, and surfing ability and to

maximize speed or stability in waves of a certain size and break.  *See, e.g.*,

*Surfboard Design*, *available at* http://360guide.info/surfing/

surfboard-design.html?Itemid=75 (last visited Oct. 20, 2007) (describing design

elements taken into consideration for custom surfboards).  When Johnson, a surfer

himself, was looking for a custom surfboard to use at Waimea, he was pointed in

Plaintiff's direction.  As Johnson recounts in "El Hombre Invisible (With

Apologies to William S. Burroughs): An Owl Chapman Story," published in the

August/September 2006 edition of *The Surfer's Journal*, a bi-monthly magazine,

> [a] good single-fin gun is hard to find.  And the guys who know
> how to shape them are either dead, too drunk, or living in some
> dusty trailer on the outskirts of Cabo.  I wanted one but was at
> a loss for names.  I talked to shaper Jeff Busman about it and
> without hesitation he mentioned Owl.
>    "Owl," Jeff said, "has never strayed from what he
> believes.  His boards are the same now as they were 20 years
> ago: flat decks, box rails, flat rocker with that beak nose.  They
> really work.  He's Brewer '71 to '73, but it's not a retro thing
> with him.  It was and is what he does.  You know, the wave at
> Sunset has never changed, so why should he?  The guy is one
> of my biggest heroes."

Defs.' Ex. O at D00107.  Thus began the story of Johnson's experience purchasing

a custom surfboard from Plaintiff, and the impetus for Plaintiff's present suit.

In the allegedly defamatory article, Johnson writes of his initial

meeting with Plaintiff:

> The measurements were made, the lines were drawn, and he
> was slicing through the foam with a handsaw.  Owl made a
> humming sound as he walked back and forth around the blank.
> He would stop here and there to make the tiniest adjustments,
> explaining to me exactly what he was doing.  Out came the
> Surform® and he ran it up and down a few times on each rail.  I

5

> looked at my watch and realized we had been there for over an hour.
>
> "Now," he said as he put the Surform® away and clapped the dust from his hands, "you see that I am almost done here, and I can finish the rest of it this week.  Do you have any money on you?"
>
> "Money?"
>
> "Yeah, money.  I need a deposit.  I don't work for free."
>
> The first rule of backyard board orders is that you never, NEVER pay up front.  But for some reason I felt powerless.  I wasn't thinking straight.  Next thing I knew, we were in my van driving to Foodland to get money out of the bank machine.
>
> "Alright," I said to Owl as I handed him a wad of cash, "you gotta promise me that you'll finish it this week."
>
> "Yeah, yeah," he said looking nervously from side to side.  "Of course.  This week."

*Id.* at D00109.  Johnson, however, did not receive his surfboard that week, or for

the next several.  He narrates his efforts to find Plaintiff, searching Plaintiff's

usual haunts, the supermarket, and the waves, all to no avail.  As Johnson writes,

> [t]he first swell of the season had come and gone, and I didn't have a board for Waimea.  This became an on-going joke with my friends.  And it was all my fault.  You NEVER pay up front.
>
> Checking the waves at Ehukai one afternoon I ran into fellow lifeguard and disgruntled airbrusher Mike Heart.
>
> "Got your board from Owl yet?" he said laughing.
>
> "What do you think?" I said, trying not to laugh with him.  "It's really not that funny."
>
> "No, I know.  It's just . . . you should've seen what happened the other day: so classic.  I was out at Sunset and Owl must have cut Bradshaw off or something, 'cause Bradshaw was pissed.  He's sitting there yelling at Owl, calling him all sorts of names and Owl's just sitting there like he could

give a shit, you know, and it's making Bradshaw madder and
madder -- his veins are popping out in his neck, his face is all
red, everybody's watching.  Finally Owl says 'You know what,
Kenny?  FUCK YOU!'  It was all-time!  So Bradshaw freaks
out and grabs Owl's head and starts dunking him over and
over, and Owl is still telling him to fuck off between dunks
'FUCK YOU . . . FUCK YOU.'  I mean, those two have been
sharing that lineup for 25 years.  It was so classic, like high
school -- the stoner and the jock.  And you know what?  The
funny thing is I think Owl got the best of him."

*Id.* at D00111.

Finally, two months after their first meeting, Johnson's surfboard was

complete.  Upon inspecting the board, Johnson said,

"Uh, Owl, . . . the rails seem a little sharp."
"What?  Give me that thing."
He grabbed the board by the rails and pointed the nose to
the sky.
"No," he said, "this is what you want.  Rails hold a line.
Are you kidding me?  You'll be doing bottom turns from
Waimea to Haleiwa!"
I had to stand my ground.  Hard rails catch chop and
there is always a good amount of chop in big waves.  "Can you
just take them down a bit?"  I said.  "Just a little softer."
"Alright," he said walking into the shack.  "It's your
board . . . ."

*Id*. at D00112.  When Plaintiff finished, Johnson

stood the thing on its tail looking up at the forward rocker, the
flattened beak nose, the sun glistening off the blood-red tinted
glass.  It was absolutely beautiful.  I wrapped my hands around
the paddleboard-like rails.  I noticed right away that Owl didn't
round off the edges like I asked him to.

7

> "Man," said Edis [Johnson's friend and master glasser] standing next to me. "It's perfect."

*Id.* at D00113.

Johnson's article is accompanied by several photographs shot by Milnor, including photos of Plaintiff surfing and at the beach, and of Plaintiff's shaping room. The August/September 2006 issue of *The Surfer's Journal* also included a four-photograph series of Plaintiff surfing with the following caption:

> Starting around 1966, the third distinct wave of Californians to invade the North Shore surf scene (following the Malibu/Santa Cruz and WindanSea crews) was a group of hard-knock teenaged standouts from the Huntington Pier who had already earned some local cred in and amongst those cement pilings and powerful sandbar conditions and for whom the Island heavies seem a natural progression . . . . Some escaped. Several augered in. A few survive intact to this day. Of that group, Owl is a survivor on his own planet. We like to inspect people like that. On page 110, Jeff Johnson, himself a piece of true grit, shares some Owl droppings. The above Jeff Divine photo set of Owl poses was taken in 1974. Since then Owl hasn't changed his act much, except at 58, he's sworn off Pipe.

Defs.' Ex. P at D00102. The liner notes included in the same issue tells another surfer's recollection of Plaintiff:

> On land he wore Coke-bottle lenses, but contacts weren't invented yet so he went out there blind. Later in his surfing career he started riding big waves; by big I mean HUGE! I always figured it was because he couldn't see what he was getting into. He was always taking these really big waves . . . . He'd just drop in and go for it, which sometimes caused bad

energy in the water because he couldn't see you.  You'd
already be in the spot, and he'd drop right in front of you and
you'd yell, "Owl!  Owl!"  And he'd look back at you startled,
like he didn't know you were there . . . but, you know, he knew
you were there. . . .  I heard he's been sober for the last year.
One year out of [the last] 40?  (Laughing) That's good!

*Id*. at D00114.

## B.   Procedural Background

Plaintiff filed a Complaint on January 3, 2007 and a First Amended

Complaint on August 15, 2007 alleging claims of defamation or libel per se,

disparagement of trade, appropriation or unauthorized use of an individual's name

or photograph in an unfavorable publication, tortious interference with business,

unjust enrichment, invasion of privacy, false light, intentional infliction of

emotional distress, and negligent infliction of emotional distress.  Defendants filed

a Motion for Partial Summary Judgment on July 26, 2007.  Plaintiff filed a

Memorandum in Opposition on September 10, 2007.[1]  Defendants filed a Reply on

September 18, 2007.  The court heard oral arguments on September 24, 2007.

---

[1] Plaintiff subsequently filed several Errata.  On September 20, 2007, two days after
Defendants filed their Reply, Plaintiff also filed an Amended Memorandum in Opposition, which
the court struck.  The next day, Plaintiff filed a request under the local rules for the court's
permission to file the Amended Memorandum in Opposition; the court granted Plaintiff's ex
parte motion during oral arguments on September 24, 2007.

## III.  <u>STANDARD OF REVIEW</u>

A party is entitled to summary judgment where there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the motion.  *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, summary judgment will be mandated if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

## IV.  <u>ANALYSIS</u>

### A.   **Plaintiff Is a Public Figure Within the Surfing Community and His Defamation and Defamation-Based Claims Are Thus Governed By the "Actual Malice" Standard**

Plaintiff alleges that the August/September 2006 issue of *The Surfer's Journal* contained defamatory content.[2]  A statement is defamatory if it "tends to

---

[2]  Plaintiff's First Amended Complaint includes Johnson's article, the photograph and caption appearing on the interior or back cover, and the liner notes, all of which were published

(continued...)

'harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him.'" *Fernandes v. Tenbruggencate*, 65 Haw. 226, 228, 649 P.2d 1144, 1146 (1982) (*quoting* Restatement (Second) of Torts § 559 (1976)).  To prevail on a defamation-based claim, a public figure plaintiff must establish (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) special harm or per se defamation; and (4) actual malice.  *See New York Times*, 376 U.S. at 279-80; *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155, 164 (1967); *Beamer v. Nishiki*, 66 Haw. 572, 578-79, 670 P.2d 1264, 1271 (1983) (*citing* Restatement (Second) of Torts § 558 (1977)).

Defendants move for partial summary judgment on the issue of whether Plaintiff is a public figure.  This is a question of law for the court.  *See Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966).  "[D]etermining precisely what individuals are public figures is an uncertain practice not readily susceptible to the application of mechanical rules." *Kroll Assocs. v. City & County of Honolulu*, 833 F. Supp. 802, 805 (D. Haw. 1993) (*citing Rosanova v. Playboy Enters., Inc.*, 411 F. Supp. 440, 443 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978) ("Defining

---

[2](...continued)
in the August/September 2006 edition of *The Surfer's* Journal.  *See* Defs.' Exs. O, P & Q.

public figure is much like trying to nail a jellyfish to the wall.")).

In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 44 (1971), a plurality opinion extended the *New York Times* actual malice standard to all "matters of public or general concern." This rule -- requiring judges to determine matters of public interest -- was abandoned three years later. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Court re-directed the focus to center on the public versus private status of the plaintiff in order to strike the proper balance between freedom of the press and society's interest in redressing claims of defamation.

> *Gertz* explained "public figure" status:
>
>> For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.

*Id.* at 345. *Gertz* justified the distinction between public and private figures on two grounds. First, public figures have "greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.* at 344. Private individuals, without access to the media or other effective means of

communication, are correspondingly more vulnerable to injury.  In other words,

unlike a private individual, a public figure is likely able to "resort to effective

'self-help.'"  *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164 (1979).

Second, and more importantly, the media may act on the assumption that "public

figures have voluntarily exposed themselves to increased risk of injury from

defamatory falsehood concerning them.  No such assumption is justified with

respect to a private individual."  *Gertz*, 418 U.S. at 345.

      The court must determine a workable framework to analyze properly

whether Plaintiff is a public figure.  Most courts addressing the public figure status

of athletes have applied the limited purpose public figure framework.  That legal

theory is inapplicable here -- Plaintiff has not inserted himself into any public

interest dispute in order to bring about its resolution; and, even if surfing could fall

within an extremely broad definition of a public interest controversy, the allegedly

defamatory publication does not directly cover Plaintiff's surfing feats or

performance but instead discusses private and personal facts, such as Plaintiff's

drug use.  Defendants thus concede that Plaintiff is not a limited purpose public

figure, and assert instead that Plaintiff tends towards being a general purpose

public figure, thereby triggering the actual malice standard.

      As articulated in *Gertz*, a general purpose public figure has

13

"achieve[d] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id*. at 351.  However, "absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Id.* at 352.  Thus, an individual who is merely "well known in some circles," but has "achieved no general fame or notoriety in the community" remains a private figure. *Id.* at 351-52.

Plaintiff argues that he is not a general purpose public figure "for all purposes and in all contexts."  Clearly, he is not a household name like legendary sports stars Michael Jordan or Tiger Woods.  In other words, as Plaintiff states, he is not a general purpose public figure for *all* purposes and in *all* contexts.  However, the question remains whether his iconic status in the surfing community makes him a public figure *within the particular context of the surfing community.*

This court does not read *Gertz's* categorizations as finite or absolute prototypes.  Plaintiff's suggestion would result in the application of an inflexible test, often ignoring the underpinnings for determining public figure status. *Gertz* recognized that it was "lay[ing] down broad rules of general application" and that "the foregoing generalities [might] not obtain in every instance." *Id*. at 343-45. *See also* Bruce W. Sanford, *Libel and Privacy* § 7.4 (2d ed.) ("[*Curtis Publ'g Co.*

14

*v. Butts*, 388 U.S. 130, 154-55 (1967)] illuminates the most common misuse of the

*Gertz* prototypes: the misconception that they are mutually exclusive.  *Butts* makes

it clear that there is a middle ground . . . .  Sports figures and entertainers are the

most frequent occupants of this position.  But the category should reach all those

who engage in endeavors in which widespread public exposure necessarily and

foreseeably accompanies success -- entertainment, sports, journalism and even

achievement in the arts and sciences. . . .  Case law reflects this reasoning.  The

courts generally conclude that sports figures, entertainers and the like are 'public

figures' -- at least for the purpose of publications relating to the cause of their

fame or notoriety, basis for achievement or fitness for position."); *Brewer v.*

*Memphis Publ'g Co., Inc.,* 626 F.2d 1238, 1254 (5th Cir. 1980) ("In our view,

however, the Court in *Gertz* did not define all subcategories of the public figure

classification."); *Barry v. Time, Inc.,* 584 F. Supp. 1110, 1120 n.13 (N.D. Cal.

1984) (stating that *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d

Cir. 1979) (en banc), "suggests that the *Gertz* test should not be applied woodenly,

and that there may be persons whose fame is pervasive in a particular field or

profession and who are public figures with respect to that field, without regard to

whether there is a particular existing controversy.").

> The court thus finds that a sports figure may be considered a general

15

purpose public figure within a limited sporting community.  To make this

determination, the court must define the applicable community, consider whether

Plaintiff is in fact a general purpose public figure in the surfing community in

general terms, whether he has access to media, whether he has assumed the risk of

publicity, and whether any public figure status has eroded over time.

### 1.    *Defining the Applicable Community and Relevant Population*

The first step is to define the limits of the community within which

Plaintiff is averred to be a public figure.  The court must therefore identify a

relevant population that is specific and particular -- that is, a clearly definable

segment of society.  *Cf. Wolston*, 443 U.S. at 165 (noting that to fall under the

actual malice standard, the allegedly defamatory statements must be inside the

sphere within which plaintiff is a limited purpose public figure).  The surfing

community is a clearly definable segment of society: Surfers ascribe to a unique

culture, lingo, style of dress, and etiquette.  *See, e.g.*, *Surfing Terminology*,

*available at* http://learntosurf.surfkooks.com/surfing-terminology/ (last visited

Oct. 20, 2007) (defining numerous surfing terms); *Surfing Etiquette*, *available at*

http://www.surfline.com/surfology/surfology_borl_index.cfm (last visited Oct. 20,

2007) (discussing rules of surfing etiquette); *What is Surf Style?*, *available at*

http://surfing.about.com/od/surfingfaq/a/122004style.htm (last visited Oct. 20,

2007) (discussing surfer chic and beach fashion).  Although the surfing industry --

boards, clothing, entertainment -- has become a multi-million dollar market which

has strongly influenced and permeated popular culture, there is still a cognizably

distinct surfing community.

The court next measures the population of the relevant community by

the distribution of the allegedly defamatory statements.  *See, e.g.*, *Harris v.*

*Tomczak*, 94 F.R.D. 687, 701 (E.D. Cal. 1982) ("The relevant population in

considering the breadth of name recognition is to be measured by the audience

reached by the alleged defamation.").  To fall under the actual malice standard, the

allegedly defamatory statements must occur within the limits of the particular

community in which Plaintiff is claimed to be a public figure.  Here, *The Surfer's*

*Journal* is a magazine dedicated to and targeted at a subsection of the surfing

community, namely mature (over 40 years of age) surfing enthusiasts, and is not

likely to appeal to ordinary sports fans or individuals with only a casual or passing

interest in surfing as sport or culture.  *See* Pezman Decl. ¶ 10.  Over 95 percent of

the magazine's subscribers are surfers.  *Id.* ¶ 4.  The court therefore finds that the

relevant population or community is the surfing community, members of which

were targeted and reached by *The Surfer's Journal*.

## 2. Plaintiff Is a Well-known, Iconic Figure in the Surfing Community

Plaintiff has been celebrated in the surfing world.  He has been featured or mentioned in several magazine articles, including *Surfer*, *The Surfer's Journal*, and *The New Yorker*.  He has appeared in surfing movies and documentaries.  In fact, he is described in the Encyclopedia of Surfing as "famous in the early and mid-70's for his tuberiding at Sunset Beach and Maalaea, and for his flamboyant 'hood ornament' stance at Pipeline."  Defs.' Ex. A at D00498.  He is further described as "one of the most dedicated surfers on the North Shore" and was featured in surf movies Cosmic Children (1970), A Sea for Yourself (1973) and Super Session (1975).  *Id.*  In short, Plaintiff is exalted as a "living legend on the North Shore . . . ."  Defs.' Ex. D at D00522.  Plaintiff is clearly a well-known and celebrated figure within the surfing community.

## 3. Access to Channels of Communication

Plaintiff argues that despite any previous notoriety, he is without access to the media and thus should not be considered a public figure.  As *Gertz* explained,

> The first remedy of any victim of defamation is self-help using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation . . . .
> [P]ublic figures usually enjoy significantly greater access to the

channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.  Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

418 U.S. at 344; *see also Butts*, 388 U.S. at 154-55 (1967) ("The courts have also, especially in libel cases, investigated the plaintiff's position to determine whether he has a legitimate call on the court for protection in light of his prior activities and means of self-defense. . . .   And both Butts [a well-known football coach and the athletic director at the University of Georgia who was accused in an article of rigging a football game against the University of Alabama] and Walker [a citizen leader of riots protesting desegregation at the University of Mississippi accused in an article of instigating violence against federal marshals] commanded a substantial amount of independent public interest at the time of the publications . . . . [B]oth commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements.").

In the case at bar, the sheer volume of published materials quoting or referencing Plaintiff indicate that the surfing media was, and continues to be, interested in him, along with his life story.  Although the record on this matter is thin, it appears to the court that if Plaintiff wanted to rebut Johnson's article --

whether through an interview, profile, or opinion piece -- the surfing media would be receptive.  Plaintiff thus had "the regular and continuing access to the media that is one of the accouterments of having become a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979).  Plaintiff, unlike a private individual, has an effective opportunity for rebuttal and could counter criticism, correct falsehoods, and set right any fallacies contained in the article.

### 4.    *The Assumed Risk of Publicity*

Plaintiff next argues that he is a private person, such that he never assumed the risk of publicity.  The court thus considers whether, and to what extent, Plaintiff purposefully assumed the risk of publicity.[3]  As the Supreme Court explained in a limited purpose public figure case, "the simple fact that . . . events attract[] media attention . . . is not conclusive of the public-figure issue.  A private individual is not automatically transformed into a public figure just by becoming involved or associated with a matter that attracts public attention." *Wolston*, 443 U.S. at 167; *see also Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) (finding that "even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public . . . [plaintiff did not] freely choose to

---

[3] "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Gertz*, 418 U.S. at 345.

publicize issues as to the propriety of her married life" and was thus a private

figure); *Gertz*, 418 U.S. at 352 ("We would not lightly assume that a citizen's

participation in community and professional affairs rendered him a public figure

for all purposes.  Absent clear evidence of general fame or notoriety in the

community, and pervasive involvement in the affairs of society, an individual

should not be deemed a public personality for all aspects of his life.  It is preferable

to reduce the public-figure question to a more meaningful context by looking to the

nature and extent of an individual's participation in the particular controversy

giving rise to the defamation.").

       Plaintiff contends that he is an intensely private person who, unlike

professional athletes, did not enter professional surfing competitions and did not

seek lucrative endorsements.  However, even assuming the truth of Plaintiff's

contentions, which the court must do under Fed. R. Civ. P. 56, Plaintiff's argument

fails if the court determines that he "invited attention and comment" through either

his position or his conduct.  As *Gertz's* references to "fame or notoriety" make

clear, both Plaintiff's surfing prowess and/or his misdeeds can catapult him to

public figure status.  Such is the case here: Plaintiff assumed a role or position of

special prominence and notoriety within the surfing community by tackling

exceptionally dangerous and difficult waves (and, according to press reports,

causing a certain degree of mischief).  *Cf. Butts*, 388 U.S. at 155 (noting that one of

the plaintiffs, a well-known football coach and athletic director, was a limited

public figure by "position alone"); *Chuy v. Philadelphia Eagles Football Club*, 431

F. Supp. 254 (E.D. Pa. 1977), *aff'd* 595 F.2d 1265 (3d Cir. 1979) (en banc)

("Where a person has, however, chosen to engage in a profession which draws him

regularly into regional and national view and leads to 'fame and notoriety in the

community,' even if he has no ideological thesis to promulgate, he invites general

public discussion.").  Moreover, the court observes that Plaintiff has not shunned or

shied from the spotlight.  Indeed, over time, Plaintiff granted several interviews,

has been photographed on numerous occasions, has appeared in surfing movies and

documentaries, and has publicly boasted of his own surfing skills and status as one

of the preeminent surfers of particular shore breaks.  *See* Defs.' Exs. A, C, E, L, M;

Pl's. Exs. 31-35, 37.  Plaintiff has also appeared in high-profile surfing events

which were filmed and screened for the public.  *See* Pezman Decl. ¶ 7.  This,

therefore, is not a case where a particularly gifted hobbyist consistently objected to,

and tried to protect himself from, the public eye.

Because Plaintiff "invited attention and comment," by choosing to

grant interviews, appear in movies, and generally act out on the public stage, *The

Surfer's Journal* was "entitled to act on the assumption that [Plaintiff had] . . .

voluntarily exposed [himself] to increased risk of injury from defamatory

falsehood[.]" *Gertz*, 418 U.S. at 345.[4]

### 5.    The Passage of Time

Finally, Plaintiff argues that even if he were a public figure during his

surfing heyday, he was a private individual by the time the allegedly defamatory

article was published.  The Ninth Circuit declined to address the question of

whether the passage of time diminishes or nullifies one's limited purpose public

figure status, noting that

> The Supreme Court has specifically declined to address whether
> an individual's status as a public figure can change over time.
> *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166 n.7
> (1979).  Few circuits have addressed this issue, and the Ninth
> Circuit is not among them.  However, it appears that every court
> of appeals that has specifically decided this question has
> concluded that the passage of time does not alter an individual's
> status as a limited purpose public figure.  *See Street v. Nat'l.*

---

[4]  Plaintiff correctly notes that Defendants cannot transform Plaintiff from a talented
surfer to a public figure through their own publications and to suit their own purposes.  *See
Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("[T]hose charged with defamation cannot, by
their own conduct, create their own defense by making the claimant a public figure."); *Kroll
Assoc.*, 833 F. Supp. at 807 (Plaintiff was not a public figure where "plaintiff merely accepted
employment as a confidential investigator of corruption within the city bus system.  To the extent
there was a controversy over the investigation or the propriety of the fees, defendants created the
controversy by their own conduct in refusing to pay the fees and in conducting their political
battle in the press.").  The court rejects, however, Plaintiff's arguments that Defendants' prior
publications concerning Plaintiff cannot be used to establish public figure status.  Plaintiff has
failed to demonstrate any nexus between prior publications and the alleged defamatory article.  It
is only the August/September 2006 issue of *The Surfer's Journal* that the court cannot consider.
In any event, even accepting Plaintiff's argument, numerous other independent surfing
publications have also covered Plaintiff.  *See* Pezman Decl. ¶¶ 3-6; Defs.' Exs. A-M, Q, W-AA.

> *Broad. Co.*, 645 F.2d 1227 (6th Cir. 1981), *cert. dismissed*, 454
> U.S. 1095 (1981); *see also Contemporary Mission v. New York
> Times Co.*, 842 F.2d 612 (2d Cir. 1988), *cert. denied*, 488 U.S.
> 856 (1988); *Wolston v. Reader's Digest Ass'n, Inc.*, 578 F.2d
> 427, 431 (D.C. Cir. 1978), *rev'd on other grounds*, 443 U.S. 157
> (1979); *Brewer v. Memphis Pub. Co., Inc.*, 626 F.2d 1238 (5th
> Cir. 1980), *cert. denied*, 452 U.S. 962 (1981); *Time, Inc. v.
> Johnston*, 448 F.2d 378, 381 (4th Cir. 1971).

*Partington v. Bugliosi*, 56 F.3d 1147, 1152 n.8 (9th Cir. 1995); *see also Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1269 (7th Cir. 1996).  This majority view appears to be analytically sound.  From a constitutional standpoint, "[i]t is no less important to allow the historian the same leeway when he writes the second or third draft" of history than when he writes the first draft.  *Street*, 645 F.2d at 1235.

This court, however, need not determine whether the passage of time alters Plaintiff's status as a general purpose public figure within a specific and particular community.  Recent publications from other surfing journals demonstrate that Plaintiff had not receded from the surfing public's view: He had been covered in *Surfer* magazine as recently as 2005, approximately a year before the article at issue in this case.  *See* Defs.' Ex. G.  Indeed, the tales of Plaintiff's surfing skills and his notoriety have been passed down to the next generation of surfers with one author observing, "I knew Owl Chapman before I met him." Defs.' Ex. E at D00527.

24

Given the preceding factors, the court finds as a matter of law that

Plaintiff is a general public figure in the limited context of the surfing community.

*Accord*, *Cepeda v. Cowles Magazines & Broad., Inc.*, 392 F.2d 417, 419 (9th Cir.

1968) ("'Public figures' are those persons who, though not public officials, are

'involved in issues in which the public has a justified and important interest.'

Such figures are, of course, numerous and include artists, athletes, business

people, dilettantes, anyone who is famous or infamous because of who he is or

what he has done.  Orlando Cepeda, the principal character in the instant suit, was

and is a 'public figure' . . . [given his] fame as an extraordinary baseball player.");

*see also Brewer*, 626 F.2d at 1254-55 (finding that a former football player was a

public figure not because he was involved in a public controversy, but due to his

fame); *Chuy*, 595 F.2d at 1280 ("Professional athletes, at least to their playing

careers, generally assume a position of public prominence. . . .  The article, which

discussed [plaintiff's] physical condition, his contractual dispute, and his

retirement, clearly concerned a man who was a public figure, at least with respect

to his ability to play football."); *Barry*, 584 F. Supp. at 1120 n.13 (N.D. Cal. 1984)

("[T]here may be persons whose fame is pervasive in a particular field or

profession and who are public figures with respect to that field, without regard to

whether there is a particular existing controversy.").  *Cf. Butts*, 388 U.S. at 154-55

25

(finding college athletic director and former coach to be a limited purpose public figure); *Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1025 n.1 (5th Cir. 1975) (finding a track coach to be a public figure "for a limited range of issues"); *Time, Inc. v. Johnston*, 448 F.2d 378, 380 (4th Cir. 1971) (finding that a basketball player was a limited purpose public figure so far as an article concerned his public performance); *Celle v. Filipino Reporter Enters., Inc.,* 209 F.3d 163, 177 (2d Cir. 2000) (finding defendant, a "well known radio commentator," was a public figure within the city's Filipino-American community); *Grayson v. Curtis Publ'g Co.*, 436 P.2d 756, 762 (Wash. 1968) (finding that a basketball coach was a limited purpose public figure); *Brooks v. Paige*, 773 P.2d 1098, 1101 (Colo. Ct. App. 1988) (holding that a soccer player was a public figure within the local sports community); *Gomez v. Murdoch*, 475 A.2d 622, 625 (N.J. Super. 1984) (finding that a professional horse jockey was a public figure for a limited range of issues).

Because Plaintiff is a public figure, he will be required to prove by clear and convincing evidence that Defendants acted with "actual malice -- that is, with knowledge that the statement was false or with reckless disregard of its truth." *New York Times*, 376 U.S. at 279-80.  The "actual malice" standard applies

26

to both Plaintiff's defamation and defamation-based claims.[5]  *See Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1187 (9th Cir. 2001); *Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 893 n.4 (9th Cir. 1988).

**B.    Plaintiff's Claim for Misappropriation/Unauthorized Use of Name and Photograph in an Unfavorable Publication Is Not Viable**

In his third cause of action, Plaintiff alleges that Defendants misappropriated and used his name and likeness in an unfavorable publication without his authorization.  To make out a common law prima facie claim for misappropriation/unauthorized use, Plaintiff must show (1) that Defendants used his photograph or name; (2) for the Defendants' commercial advantage; (3) without Plaintiff's consent; and (4) thereby injured Plaintiff.  *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1182 (C.D. Cal. 2002).  Liability under this legal theory is generally limited to unauthorized use in connection with the promotion or advertisement of a product or service and not, as is the case here,

---

[5]  Tort claims which are found to be artfully pled defamation claims will be analyzed under the applicable defamation framework and will be disallowed where the defamation claims themselves are invalid as a matter of law.  *See Dworkin v. Hustler Magazine*, 867 F.2d 1188, 1193 n.2 (9th Cir. 1989) (noting that "[t]he district court . . . properly granted summary judgment on Dworkin's emotional distress claims . . . .  The district court reasoned, 'whatever the label, Dworkin cannot maintain a separate cause of action for mental and emotional distress where the gravamen is defamation.' *Dworkin*, 668 F. Supp. at 1420.  As we recently noted, 'an emotional distress claim based on the same facts as an unsuccessful libel claim cannot survive as an independent cause of action.' *Leidholdt*, 860 F.2d at 893 n. 4.").

for use in a magazine story.  This is true even if the article was arguably motivated by *The Surfer's Journal's* desire for profits or tangentially results in increased income.  *See* Restatement (Second) of Torts § 652C, cmt. d (1977) ("It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.  The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness.  Thus a newspaper, although it is not a philanthropic institution, does not become liable under the rule stated in this Section to every person whose name or likeness it publishes.");[6] *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1122-23 (N.D. Cal. 2002) (finding that the First Amendment protected use of the plaintiff's likeness in advertisements for a television show because the television show was an expressive work and the advertisements were an adjunct of the protected work and promoted the protected expression); *see also Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 867

---

[6] In considering various invasion of privacy claims, Hawaii courts have referred to the Restatement (Second) of Torts §§ 652A-E (1977).  *See Mehau v. Reed*, 76 Haw. 101, 111, 869 P.2d 1320, 1330 (1994); *State of Hawaii Org. of Police Officers v. Soc'y of Prof'l Journalists-Univ. of Hawaii Chapter,* 83 Haw. 378, 398, 927 P.2d 386, 406 (1996); *Chung v. McCabe Hamilton & Renny Co., Ltd.*, 109 Haw. 520, 534, 128 P.3d 833, 847 (2006).

(Cal. 1979) ("Entertainment is entitled to the same constitutional protection as the exposition of ideas.").

More important, Defendants' publication of "newsworthy" matters which are "in the public interest," is constitutionally privileged. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) ("'[N]o cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'" (citations omitted)); *Virgil v. Time, Inc.*, 527 F.2d 1122, 1128-29 (9th Cir. 1975) ("The privilege to publicize newsworthy matters is included in the definition of the tort set out in Restatement (Second) of Torts § 652D (Tentative Draft No. 21, 1975).  Liability may be imposed for an invasion of privacy only if 'the matter publicized is a kind which . . . is not of legitimate concern to the public.'  While the Restatement does not so emphasize, we are satisfied that this provision is one of constitutional dimension delimiting the scope of tort law and that the extent of the privilege thus is controlled by federal rather than state law.").

> Newsworthiness is a
>
> line . . . to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern.

*Virgil*, 527 F.2d at 1129.  The First Amendment newsworthiness defense "extends 'to almost all reporting of recent events,' as well as to publications about 'people who, by their accomplishments, mode of living, professional standard or calling, create a legitimate and widespread attention to their activities.'"  *Downing*, 265 F.3d at 1001 (citations omitted).

Defendants argue that surfing is newsworthy and a matter of public interest under the reasoning set forth in *Dora v. Frontline Video*, 18 Cal. Rptr. 2d 790, 792 (Cal. Ct. App. 1993), in which the court found that a documentary chronicling the events and personalities of Malibu's early days of surfing was protected by the First Amendment.  That court observed that

> surfing is more than passing interest to some.  It has created a lifestyle that influences speech, behavior, dress, and entertainment, among other things.  A phenomenon of such scope has an economic impact, because it affects purchases, travel, and the housing market.  Surfing has also had a significant influence on the popular culture, and in that way touches many people.  It would be difficult to conclude that a surfing documentary does not fall within the category of public affairs.

*Id.* at 794-95.  The court thus found that the documentary's producers were not required to secure the plaintiff's consent prior to using his name, likeness, or voice.  *Id.* at 793-94; *see also Downing*, 265 F.3d at 1002 (observing that "surfing and surf culture" is "a matter of public interest").

30

The court finds persuasive *Dora's* teachings that journalism explaining, profiling, or examining a social subculture, such as surfing, is valuable and relevant because it serves as a type of anthropological reflection on modern society.  The court notes, however, that the publication at issue in the case at bar does not address surfing in a generalized or historical sense, but instead focuses on the personality and behavior of one particular individual.  Although the newsworthiness of such a piece may be suspect, Plaintiff is an iconic figure in the surfing world and his place in surfing history is secure.  Johnson's tale of his interactions with Plaintiff -- including Plaintiff's quirky mannerisms, quips, and colorful history -- sheds light on one of surfing's more intriguing personalities and, by extension, on the sport and culture itself.  The August/September 2006 volume of *The Surfer's Journal* captures a sliver of the surfing subculture, fleshes out our impression of a legend of the sport, illuminates the difficulties that may arise when doing business in the surfing community, and provides insight into the fast-growing and highly profitable board shaping market.  The published article, photographs, and liner notes are newsworthy and relevant.  The court GRANTS Defendants' Motion for Partial Summary Judgment as to Plaintiff's claim for misappropriation/unauthorized use.

**C.     Plaintiff Cannot Make Out a Claim for Invasion of Privacy**

In his sixth cause of action, Plaintiff alleges that Defendants invaded his privacy.  The court construes this claim as an allegation of public disclosure of private facts.  To make out a prima facie claim of public disclosure of private facts, Plaintiff must show (1) public disclosure of facts regarding Plaintiff; (2) that the facts disclosed were private facts; (3) that the disclosure is highly offensive and objectionable to a reasonable person; and (4) the facts disclosed are not of legitimate concern to the public.  *See* Restatement (Second) of Torts § 652D (1977).

Facts concerning Plaintiff's drug use and drinking are not private because they were previously disclosed in other publications.  *See, e.g.*, Defs.' Ex. D at D00523 ("Owl will be really crazed, smoke a big joint, and [surf a huge wave].");  Defs.' Ex. F at D00534-36 (referring to Plaintiff's drug use); Defs.' Ex. K at D00586 (describing Plaintiff's escapades with a fellow surfer in which the two went on a road trip involving drugs, stolen license plates, and an arrest). Because these facts were published and disseminated within the surfing community by other sources, they were part of the public or historical record. Defendants cannot be held liable under an invasion of privacy theory for

publishing previously circulated facts regarding Plaintiff's drug use and drinking.[7]

The next question is whether the publication of derisive commentary regarding Plaintiff's custom board shaping and business transactions constitutes the public disclosure of private facts. The court finds that it is not. First, the court notes that Plaintiff's board shaping business and his interactions with Johnson do not appear to have been private facts: Plaintiff created a business and placed his products into the stream of commerce. An ordinary merchant does not have an expectation of privacy regarding his sales and business transactions with customers. Moreover, the content of Johnson's article is not of a nature that an ordinary and reasonable person would find objectionable -- although being profiled as tardy and unresponsive might sting, it is not highly offensive and objectionable to a reasonable person. Finally, as discussed previously, the court finds that Johnson's article addresses a legitimate and newsworthy topic of public interest. The court thus finds that Plaintiff has failed to set forth facts sufficient to make out an element of his prima facie privacy claim and that Defendants' publication was privileged. *See, e.g.*, *Shulman v. Group W. Prods., Inc.*, 955 P.2d

---

[7] Plaintiff claims that Defendants' publications characterize him as a criminal. To the extent that such characterizations rest on his drug use, Plaintiff's claim is rejected for the same reasons as previously discussed. However, Plaintiff also attempts to argue that he is impliedly characterized as a criminal through Defendants' reference to William Burroughs in the title of the article. This argument is so far-fetched and highly attenuated that it lacks any merit whatsoever.

469, 479 (Cal. 1998) ("Although we speak of the lack of newsworthiness as an element of the private facts tort, newsworthiness is at the same time a constitutional defense to, or privilege against, liability for publication of truthful information."). The court GRANTS the Defendants' Motion for Partial Summary Judgment as to Plaintiff's invasion of privacy claim.

**D.      The Court Denies Defendants' Motion for Summary Judgment as to Plaintiff's False Light Claim**

Defendants argue that the Hawaii courts have not yet recognized a false light cause of action and submit that Plaintiff's claim is invalid as a matter of law. The court observes that the Hawaii Supreme Court has approvingly cited the Restatement (Second) of Torts § 652 (1977) which recognizes a false light claim. *See Chung v. McCabe Hamilton & Renny Co., Ltd.*, 109 Haw. 520, 534-35, 128 P.3d 833, 847-48 (2006) ("In order to establish a claim for false light invasion of privacy, the plaintiff must show that defendant had 'knowledge of . . . or reckless disregard as to the falsity of the publicized matter and the false light in which [the plaintiff] would be placed[,]' Restatement § 652E, which would be 'highly offensive to a reasonable person[.]' *Id.*"); *Mehau v. Reed*, 76 Haw. 101, 111, 869 P.2d 1320, 1330 (1994) ("[T]he Restatement (Second) of Torts §§ 652A-E (1977), recognizes a tort of invasion of privacy. The Restatement categorizes the tort into

34

four types: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to the other's private life; and (4) false light.  'As it has developed in the courts, the invasion of the right to privacy has been a complex of four distinct wrongs.'" (*citing* Restatement (Second) of Torts § 652A cmt. b (1977)).  However, as was discussed during oral argument, the court declines to consider this issue given the lack of complete briefing of both parties.  The court DENIES Defendants' Motion for Partial Summary Judgment as to Plaintiff's false light claim without prejudice.

## V.  <u>CONCLUSION</u>

The court GRANTS Defendants' Motion for Partial Summary Judgment as to the issue of whether Plaintiff's defamation and defamation-based claims are governed by the actual malice standard.  The court also GRANTS Defendants' Motion for Partial Summary Judgment as to Plaintiff's claims for misappropriation/unauthorized use and invasion of privacy.  The court DENIES

\\\

\\\

\\\

\\\

\\\

Defendants' Motion for Partial Summary Judgment as to Plaintiff's false light claim.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 6, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Chapman v. Journal Concepts, Inc.*, Civ. No. 07-00002 JMS/LEK, Order Granting in Part and Denying in Part Defendants' Motion for Partial Summary Judgment