IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CRAIG ELMER ("OWL") CHAPMAN, | ) CIVIL NO.  07-00002 JMS/LEK |
| | ) |
| | ) ORDER (1) GRANTING IN PART |
| Plaintiff, | ) AND DENYING IN PART |
| | ) DEFENDANTS' MOTION FOR |
| vs. | ) SUMMARY JUDGMENT AND |
| | ) (2) DENYING PLAINTIFF'S |
| JOURNAL CONCEPTS, INC., A | ) MOTION FOR SUMMARY |
| CALIFORNIA CORPORATION, | ) JUDGMENT |
| d.b.a. THE SURFER'S JOURNAL; | ) |
| JEFF JOHNSON; STEVE PEZMAN; | ) |
| DEBEE PEZMAN; DAN MILNOR; | ) |
| SCOTT HULET; and JEFF DIVINE, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**ORDER (1) GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
(2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I. <u>INTRODUCTION</u>

Craig Elmer "Owl" Chapman ("Plaintiff"), a surfer and surfboard craftsman, sued *The Surfer's Journal* ("*The Journal*"), author Jeff Johnson ("Johnson"), photographer Dan Milnor ("Milnor"), editor Scott Hulet ("Hulet"), photo editor Jeff Divine ("Divine"), and publishers Steve Pezman ("Pezman") and Debbee Pezman (collectively, "Defendants") over an August/September 2006 magazine issue in which Defendants published an article purportedly recounting

Johnson's pursuit of a custom-shaped single-fin surfboard, and including photographs and other surfers' recollections of Plaintiff.  Currently before the court are Defendants' and Plaintiff's Motions for Summary Judgment.[1]  For the foregoing reasons, the court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

## II.  BACKGROUND

A.    **Factual Background**[2]

1.    ***The Parties***

a.    *Plaintiff Owl Chapman*

Plaintiff is a well known surfer and surfboard shaper in the North Shore of Oahu, Hawaii.  *See* Defs.' Mot. Exs. B at D522, C at D527;[3] Chapman Sept. 9 Decl. ¶ 3.  Surf publications have referred to him as "bizarre," Defs.' Mot.

---

[1]  Due to illness of Plaintiff's counsel, Plaintiff requested that the hearing on these Motions be waived.  Pursuant to Local Rule ("L.R.") 7.2(d), these Motions may be decided without oral argument.

[2]  The facts underlying the dispute are also set forth in the November 7, 2007 Order Granting in Part and Denying in Part Defendants' Motion for Partial Summary Judgment ("November 7, 2007 Order") on the issue of Plaintiff's public figure status.  *See Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d 1081, 1085-88 (D. Haw. 2007).

[3]  Defendants attach one set of exhibits to their Separate and Concise Statement of Material Facts in Support of their Motion for Summary Judgment ("Defs.' Mot. Exs."), one set to their Separate and Concise Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Opp'n Exs."), and one set to their Reply ("Defs.' Reply Exs.").

Ex. C at D527, prone to "anti-hero antics," *id.*, involved with "the odd psychedelic something," Defs.' Reply Ex. M at D536, "really crazed," Defs.' Reply Ex. N at D523, "the man time forgot[,]" Defs.' Reply Ex. Q at D517, and on "the fine line between profound philosopher and space cadet." *Id.*; *see also* Defs.' Mot. Exs. B at D524 ("Owl, I don't know . . . he just lost it; thought he was a . . . rock star."), C at D527 ("From what I know, [Owl's] mind expanded many years back and never returned to normal."), *id.* at D528 ("[T]rying to comprehend Owl can be like a kid trying to figure out Pee Wee Herman[.]").

Additionally, prior publications have referenced Plaintiff's alcohol and drug use. *See* Defs.' Reply Exs. M at D535-36, D538 (referring to Plaintiff consuming mescaline, chillums, and mushrooms), N at D523 ("Owl will be really crazed, smoke a big joint and [surf Waimea].”), O at D586 (describing Plaintiff and Michael Peterson as the "doped-up duo" that "secured a stash of drugs strong enough to kill a small horse" for their Australian road trip), and P at D607 (quoting Plaintiff saying, "I've got a lot of alcohol in me there" below photo of himself surfing).

   *b.*   *Defendants*

Debbee and Steve Pezman are the co-publishers of *The Journal*, a bi-monthly magazine about surfing with a total circulation of approximately 38,000.

3

Pezman Aug. 28 Decl. ¶¶ 2, 4.  Hulet and Divine are *The Journal's* editor and photo editor, respectively.  *Id.* ¶ 3.

In the August/September 2006 issue of *The Journal*, the subject of this action, Johnson wrote "El Hombre Invisible (With Apologies to William S. Burroughs) An Owl Chapman Story" (the "Article"), and Pezman wrote the liner notes on the front and back pages of the magazine in the same issue ("Liner Notes").  *Id.* ¶ 6; Defs.' Mot. Ex. D.  Milnor took the photographs that appear in the Article and the Liner Notes (collectively, the "Magazine").  Pezman Aug. 28 Decl. ¶ 7.

### 2.   *The Article and Liner Notes*

#### a.   *Defendant's version of the Magazine and underlying facts*

In 2005, *The Journal* received an unsolicited freelance photograph of Plaintiff, which sparked the editorial staff's decision to publish a feature article about Plaintiff.  Hulet Decl. ¶ 2.  Hulet, as editor of *The Journal*, contacted Johnson and asked him if he would write a feature article on Plaintiff.  Johnson Decl. ¶ 5; Hulet Decl. ¶ 3.  Johnson proposed an article based on his experience ordering a surfboard from Plaintiff, and Hulet agreed.  *Id.*

///

///

4

i.      The Article

Sometime in the mid-1990s, Johnson claims that he ordered a custom single-fin surfboard from Plaintiff and recorded the related events in his personal journal -- which subsequently became the subject of the Article.  Johnson Decl. ¶ 4; Defs.' Mot. Ex. I at 2.[4]  Johnson alleges that he wrote the Article using his memory and journals and that all of the factual events described in the Article occurred and are recounted "as accurately as [he] could remember."  Defs' Mot. Ex. I at 4; *see also* Johnson Decl. ¶¶ 6, 7.[5]  Johnson also asserts that the quotations attributed to Plaintiff in the Article are Plaintiff's own words.  Pl.'s Opp'n Ex. 17 ¶¶ 169, 172.  Johnson, however, did not contact Plaintiff in the process of writing the Article because he wanted the Article to provide a third-person view of Plaintiff, rather than Plaintiff's perception of himself.  Johnson Decl. ¶ 6; Pl.'s Opp'n Ex. 17 ¶¶ 89-90, 92; Defs.' Mot. Ex. I at 3.

As described in the Article, Johnson alleges that he came across Plaintiff in his search for a single-fin surfboard --

---

[4]  Johnson no longer possesses or knows the whereabouts of the custom surfboard he purchased from Plaintiff.  Pl.'s Opp'n Ex. 17 ¶¶ 138-39.

[5]  Johnson misplaced or threw out most of his journals before this lawsuit began.  Defs.' Mot. Ex. I at 3 (interrogatory answer 1c); Pl.'s Mot. Ex. 5a.  Neither Hulet nor Pezman verified or checked that Johnson possessed these notes or journals.  Pl.'s Opp'n Ex. 16 ¶ 15; Pl.'s Opp'n Ex. 15 ¶¶ 5-7.

> A good single-fin gun is hard to find.  And the guys who know how to shape them are either dead, too drunk, or living in some dusty trailer on the outskirts of Cabo.  I wanted one but was at a loss for names.  I talked to shaper Jeff Bushman about it and without hesitation he mentioned Owl.
>
> "Owl," Jeff said, "has never strayed from what he believes.  His boards are the same now as they were 20 years ago: flat decks, box rails, flat rocker with that beak nose.  They really work.  He's Brewer '71 to '73, but it's not a retro thing with him.  It *was* and *is* what he does.  You know, the wave at Sunset has never changed, so why should he?  The guy is one of my biggest heroes."

Defs.' Mot. Ex. D at D107.  And so begins Johnson's Article.

In the Article, Johnson colorfully describes each step of his experience ordering a surfboard from Plaintiff.  For example, Johnson paints the picture of Plaintiff's shaping room --

> As I stepped past Owl in his shaping bay, I could hear the floorboards squeak eerily beneath my feet.  He turned on the lights and I became slightly dizzy.  The entire room was off kilter: the walls had been patched with assorted wood scraps, and I could see wet ground through the cracks in the floor.  The ceiling was low, rotten.  When Owl walked to the back of the room, he seemed to get bigger, or the room got smaller, I don't know.
>
> Owl threw my blank onto the padded U's.  "Okay," he said, "what do you want here?"
>
> Before I could answer, he waved a hand in through [sic] the air and said, "First, tell me what you think you want, and I'll tell you want you need."
>
> It was *Naked Lunch* meets *Through the Looking Glass*.  What had I gotten into here?  I asked myself.

*Id.* at D109.  After paying Plaintiff in advance for the surfboard -- against what

Johnson dubs the "first rule of backyard board orders" -- Johnson asserts that he

searched for, and was eluded by, Plaintiff for almost two months. *Id.* at D109-12.

Johnson chronicles his search --

> One day I saw [Plaintiff] riding a bike down Ke Nui
> Road. I followed him into a driveway and he was gone, just
> like that. Then there was the night where I thought I had him. I
> saw him walk into Foodland so I waited for him outside. I
> waited a long time. Eventually I went inside to find him and he
> wasn't there. "Old Bull Lee," I said to myself, "*El Hombre
> Invisible*!"
> The first swell of the season had come and gone, and I
> didn't have a board for Waimea. This became an on-going joke
> with my friends. And it was all my fault. You NEVER pay up
> front.

*Id.* at D111. After two months had passed and "[he] finally gave up and stopped

looking," Johnson claims that Plaintiff found him one morning and showed him his

finished, unglassed board. *Id.* at D112. At that time, Johnson recalls asking

Plaintiff to take down the rails a bit. *Id.*

Shortly thereafter Johnson heard his board was complete and he

hurried over to Jack Reeve's glass shack to it pick up --

> I stood the thing on its tail looking up at the forward rocker, the
> flattened beak nose, the sun glistening off the blood-red tinted
> glass. It was absolutely beautiful. I wrapped my hands around
> the paddleboard-like rails. I noticed right away that Owl didn't
> round the edges off like I asked him to.
> "Man," said Edis standing next to me. "It's perfect."

7

> I put the board under my arm barely reaching my hand around to feel the sharp tucked-in rail.  "Not perfect," I said.  "Convenient.  Nothing in this world is perfect."

*Id.* at D113.

In the Article, Johnson also quotes people that he encountered during his search for Plaintiff.  For example, Johnson writes that while

> [c]hecking the waves at Ehukai one afternoon I ran into fellow lifeguard and disgruntled airbrusher Mike [Hart].[6]
>
> "Get your board from Owl yet?" he said laughing.
>
> "What do you think?" I said trying to laugh with him, "It's really not that funny."
>
> "No, I know.  It's just . . . you should've seen what happened the other day: so classic.  I was out at Sunset and Owl must have cut Bradshaw off or something, 'cause Bradshaw was pissed.  He's sitting there yelling at Owl, calling him all sorts of names and Owl's just sitting there like he could give a shit, you know, and it's making Bradshaw madder and madder -- his veins are popping out in his neck, his face is all red, everybody's watching.  Finally, Owl says, 'You know what, Kenny?  FUCK YOU!'  It was all-time!  So Bradshaw freaks out and grabs Owl's head and starts dunking him over and over, and Owl is still telling him to fuck off in between dunks 'FUCK YOU . . . FUCK YOU.'  I mean, those two have been sharing the lineup for 25 years.  It was so classic, like high school -- the stoner and the jock.  And you know what?  The funny thing is I think Owl got the best of him."

---

[6]  Mike Hart's name was misspelled "Mike Heart" in the Article.

*Id.* at D111.  Johnson asserts that he called all of the people he quoted in the

Article, told each person what he was writing about, and each person confirmed his

quote.  Defs.' Mot. Exs. E, I at 3, 8.

The Article also contains several references to William S. Burroughs

("Burroughs") and his works.  *See* Defs.' Mot. Ex. D.  The title includes a

reference to Burroughs, Johnson describes his experience in Plaintiff's shaping

room as "*Naked Lunch* meets *Through the Looking Glass*," and Johnson refers to

Plaintiff as "Old Bull Lee" and "*El Hombre Invisible*!" (twice) while searching for

him and his commissioned surfboard.  *See id.* at D109, D111-12.[7]

Johnson presented the Article as an accurate account of his first-hand

interactions with Plaintiff and told Hulet he would verify the quotes in the Article

by checking his notes, contacting friends who were present when he interacted

with Plaintiff, and confirming quotations of individuals quoted in the Article.  *See*

Pl.'s Opp'n Exs. 3, 18 at 9 (interrogatory answer 5b).

      ii.     The Liner Notes

Pezman asserts that he wrote the Liner Notes based upon his personal

recollection and a valid, prepublication interview with fellow surfers Jackie Baxter

---

[7] Johnson admits that the literary allusions to Burroughs in the Article are meaningful, Pl.'s Opp'n Ex. 17 ¶ 77, and that he intended to compare Plaintiff to certain aspects of Burroughs, his reputation, and his literary works.  *Id.* ¶ 42.

("Baxter") and Herbie Fletcher ("Fletcher"), who knew Plaintiff personally.[8]

Pezman Aug. 28 Decl. ¶ 6; Pezman Oct. 3 Decl. ¶¶ 2-5; Pl.'s Opp'n Ex. 15 ¶¶ 12,

22.  On page one of the Magazine, Pezman begins --

> Starting around 1966, the third distinct wave of Californians to
> invade the North Shore surf scene . . . was a group of hard-
> knock teenaged standouts from the Huntington Pier who
> already earned some local cred in and amongst those cement
> pilings and powerful sandbar conditions and for whom the
> Island heavies seemed a natural progression. . . .  A few survive
> intact to this day.  Of that group, Owl is a survivor on his own
> planet.  We like to inspect people like that.  On page 110, Jeff
> Johnson, himself a piece of true grit, shares some Owl
> droppings.

Defs.' Mot. Ex. D at D102.

Pezman continues his coverage of Plaintiff on the back inside cover of

the Magazine --

> [i]n contrast to the conventions of the day, [Plaintiff] was an
> extreme soul surfer, to the point that his dance would take on
> ritualistic forms. . . .  [Plaintiff] hardened into a country fixture,
> his outspoken eccentric persona becoming yet another strand in
> the rich human fabric of that stretch of lava and sand.  This
> issue's article by Jeff Johnson uses the task of getting a gun
> board out of Owl to reveal more of him.  But being an old pier

---

[8] On June 15, 2007, Defendants provided Plaintiff with an audiotape claiming to be
Pezman's late April or early May 2006 interviews of Baxter and Fletcher.  *See* Pl.'s Reply Ex. 6;
Pezman Oct. 3 Decl. ¶¶ 2-5.  Plaintiff attaches a copy of the audiotape, a transcript prepared by
the Audio Forensic Center ("professional transcript"), and a transcript prepared by Defendants'
paralegal.  *See* Pl.'s Opp'n Ex. 1; Pl.'s Mot. Ex. 1; Pl.'s Reply Ex. 1.  Defendants have also
attached a copy of the audiotape.  Defs.' Reply Ex. K.

rat myself, I couldn't resist amplifying a bit further.  To do so I
went to two of Owl's old pier / North Shore cohorts.

*Id.* at D114.  Pezman then quotes Baxter and Fletcher.  Baxter is quoted as

remembering Plaintiff in the surf scene around 1966 --

> [Plaintiff] was always doing "in the hook" things, taking it as
> far as you could take it, and the thing is he was totally blind out
> there.  On land he wore Coke-bottle glasses, but contacts
> weren't invented yet so he went out there blind.  Later in his
> surfing career he started riding big waves; by big I mean
> HUGE!  I always figured it was because he couldn't see what
> he was getting into.  He was always taking these really big
> waves that scared the shit out of me and it really pissed me off!
> He'd just drop in and go for it, which sometimes caused bad
> energy in the water because he couldn't see you.  You'd already
> be in the spot, and he'd drop right in front of you and you'd
> yell, "Owl! Owl!" And he'd look back at you startled, like he
> didn't know you were there . . . but, you know, he knew you
> were there.  (Laughing[.])

*Id.*  Pezman also quotes Baxter on Plaintiff's current sobriety --

> [Plaintiff] moved to the North Shore and never left.  He's been
> there for 40 years stuck in a time capsule.  Things don't change
> there; it's like living in a Hawaiian time warp.  I heard he's
> been sober for the last year.  One year out of 40?
> ([L]aughing[.]) That's good!  And I know firsthand.  I did my
> own time capsule over there.  I'm a veteran.

*Id.*  Next, Pezman reports Fletcher's recollections of Plaintiff surfing at Sunset

Beach during the 1960s: "I remember Owl ran over Walter Hoffman right in front

of me he was so blind. . . .  Owl was always a soul monster.  In the [1960s],

everybody was into soul, and soul came from the heart."  *Id.*

11

While Pezman has not had direct, personal contact with Plaintiff since the early 1970s, Pl.'s Opp'n Ex. 15 ¶ 28, he believes that the material in the Article and Liner Notes is truthful and accurate. *Id.* ¶ 22.

        **b.**    *Plaintiff's view of the Magazine and underlying facts*

Plaintiff disputes all of the facts asserted in the Article, disputes all underlying facts in the Liner Notes, and questions the accuracy of the quotations in both. *See* Chapman Oct. 3 Decl. ¶¶ 2-5, 15-16. Plaintiff also asserts that a number of the statements in the Magazine defame him.[9]

        **i.**    The Article

Plaintiff claims he never shaped a 10 foot surfboard for Johnson -- the subject of the Article -- at anytime in the mid-1990s, denies the board existed, *id.* ¶ 3, does not recall calling Kelly Slater a "little fucker," Chapman Sept. 9 Decl. ¶ 10, does not recall having a physical altercation and shouting match with Ken Bradshaw in the 1990s, *id.* ¶ 11,[10] and maintains that Johnson has never been in

---

[9] While Plaintiff has not separately identified each allegedly defamatory statement in his Opposition (or his Motion or Reply), in discovery Plaintiff identified twenty-five passages of the Article and Liner Notes that he asserts are defamatory. *See* Defs.' Exs. F, G. Due to the length of the alleged defamatory sections, the court has not reproduced them in full here.

[10] Plaintiff does, however, "vividly remember Ken Bradshaw physically attacking [him] in the water at Sunset Beach sometime around 1985 or 1986;" but he does not recall Mike Hart, a lifeguard at Sunset in the 1990s and early 2000s (but not in the 1980s), being present at the time that altercation occurred. Chapman Sept. 9 Decl. ¶ 11; *see also* Pl.'s Opp'n Ex. 10 (Spring 2001 *The Surfer's Journal* article recalling when "[Bradshaw] tackled Owl Chapman on a

(continued...)

any of his shaping rooms.  *Id.*  Plaintiff claims that the Article generally misrepresents the nature of the way he usually conducts business "in ways that are false or distorted."  *Id.* ¶¶ 4-5.  Plaintiff also disputes that Johnson verified the quotes in the Article -- specifically, Plaintiff asserts that Johnson never called Pete Matthews.[11]  *See* Matthews Decl. ¶¶ 2-13.

ii.    The Liner Notes

Plaintiff also completely denies "the alleged 'truth' of the 'factual' statements published" in the Liner Notes -- simply, Plaintiff asserts Pezman, Baxter, and Fletcher all "get all the facts wrong."  Chapman Oct. 3 Decl. ¶¶ 4-5, 15-16.  Plaintiff identifies the following errors: (1) he moved to the North Shore in 1968 not 1967, *id.* ¶ 9; (2) he surfed for Mike Diffenderfer's "surf team" from 1968 to 1969, long before he became acquainted with Dick Brewer, *id.* ¶ 10; (3) his first "Plastic Fantastic" surfboard was shaped by Bruce Jones, not Dick Brewer, *id.* ¶ 11; (4) he never "hung around the Plastic Fantastic surfboard factory" with Dick Brewer in 1966 or 1967, *id.* ¶¶ 12-13; and (5) he was never around Dick Brewer when he shaped "Pipeliners" for Bing Copeland.  *Id.* ¶ 14.

---

[10](...continued)
wave").

[11]  Pete Matthews name was misspelled "Pete Mathews" in the Article.

Plaintiff asserts that Baxter and Fletcher -- who are extensively cited in the Liner Notes -- are known drug dealers and, therefore, unreliable sources of information.  *Id.* ¶ 19; *see also* Gary Chapman Decl. ¶¶ 10-12.   Further, Plaintiff notes that he has not interacted with Baxter since 1970.  Chapman Oct. 3 Decl. ¶ 6.[12]

### 3.   *The Journal and its Editorial Process*

*The Journal* is a high-end surf magazine geared toward adult surfers, sometimes referred to as the "*National Geographic* of surfing."  Pl.'s Opp'n Ex. 9; Pezman Aug. 28 Decl. ¶ 4.  Due to its reader (as opposed to advertising) support, *The Journal* is "free to tell the truth and explore the peripheries while emphasizing purist non-commercial aspects that are at the core of wave riding."  Pl.'s Reply Ex. 10.

*The Journal* has a small editorial staff and does not have a dedicated fact checking department.  Pezman Aug. 28 Decl. ¶ 8.  In a piece of straight journalism, the editor or his associate reads the draft for "nouns, locations, dates, results, etc." and then marks and confirms each using available sources, including *The Encyclopedia of Surfing*, past publications, and sometimes personal contact.

---

[12] Plaintiff also disputes knowing Fletcher in California "at the Huntington Pier around 1966," Chapman Oct. 3 Decl. ¶ 7 (emphasis removed), or surfing with him at Sunset Beach.  *Id.* ¶¶ 8, 17.

14

Hulet Decl. ¶ 4.  The vast majority of people, events, and places found in *The Journal* are well-known to the editorial staff, which has over one hundred years of collective experience in the surfing community.  *Id.*  When an article is designed, the editor, associate editor, photo editor, publisher, and production manager are all "charged with marking up factual errors and conferring with the editor on how best to correct identified errors."  *Id.*  The editor also generally performs fact-checking in a submission for publication if he believes the submission contains material that is false or unduly negative.  Pezman Aug. 28 Decl. ¶ 9.  *The Journal* does not have a written policy governing fact-checking direct quotations.  Pl.'s Opp'n Ex. 16 ¶ 109.

Hulet did not verify the quotes or facts in the Article or Liner Notes, Pl.'s Opp'n Ex. 16 ¶ 25, and Pezman did not confirm the facts or quotes in the Article or verify the underlying facts in the Liner Notes.  *See id.* ¶¶ 57, 65.

## B.    Procedural Background

Plaintiff filed his Complaint on January 3, 2007 and filed his First Amended Complaint on August 15, 2007 ("Amended Complaint") alleging claims of (1) defamation or libel per se, (2) disparagement of trade, (3) appropriation or unauthorized use of an individual's name or photograph in an unfavorable publication, (4) tortious interference with business, (5) unjust enrichment,

(6) invasion of privacy, (7) false light, (8) intentional infliction of emotional distress ("IIED"), and (9) negligent infliction of emotional distress ("NIED").

In the November 7, 2007 Order, the court: (1) found that Plaintiff is a general public figure within the surfing community and that his defamation and defamation-based claims are governed by the actual malice standard set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) and its progeny; (2) granted summary judgment for Defendants as to Plaintiff's claims for invasion of privacy and misappropriation/unauthorized use of his name and photograph in an unfavorable publication; and (3) denied summary judgment for Defendants on Plaintiff's false light claim. *Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d 1081, 1095-99 (D. Haw. 2007).

On September 10, 2008, Defendants and Plaintiff each filed a Motion for Summary Judgment. Plaintiff filed an Opposition on September 25, 2008; Defendants filed an Opposition on September 26, 2008. On October 3, 2008, Defendants and Plaintiff each filed a Reply. On November 21, 2008, Defendants and Plaintiff each filed a Supplemental Opposition.

### III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.

16

R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest on mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126, (9th Cir. 2008) (stating that "the evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV. <u>ANALYSIS</u>

### A.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the remaining claims in Plaintiff's Amended Complaint.  Defendants argue that Plaintiff's defamation and defamation-based claims (*i.e.*, Plaintiff's claims of defamation or libel per se, disparagement of trade, tortious interference with business, false light, IIED, and NIED) fail because: (1) the alleged defamatory statements do not imply objective facts or, in the alternative, are not reasonably susceptible to defamatory meaning; and (2) Plaintiff cannot show actual malice with convincing clarity.  Defendants

also assert that Plaintiff's tortious interference and unjust enrichment claims are not viable.  In opposition, Plaintiff claims that Defendants' statements are provably false, indicate "objective truth," and contain defamatory meaning.  Plaintiff also maintains that the evidence shows that Defendants acted with actual malice either by knowing their statements were false or recklessly disregarding their veracity. For the reasons below, the court DENIES in part and GRANTS in part Defendants' Motion for Summary Judgment.

### 1.      *Plaintiff's Defamation and Defamation-Based Claims*

To prevail on his defamation and defamation-based claims, Plaintiff as a public figure must establish (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) special harm or per se defamation; and (4) actual malice.  *See Beamer v. Nishiki*, 66 Haw. 572, 578-79, 670 P.2d 1264, 1271 (1983) (citing Restatement (Second) of Torts § 558 (1977)); *see also New York Times*, 376 U.S. at 279-80.  "[P]laintiff must establish as a matter of law each element of defamation by a preponderance of the evidence except the element of actual malice, which must be proven with a higher standard of 'clear and convincing proof.'"  *See Beamer*, 66 Haw. at 578, 670 P.2d at 1270 (quoting *Rodriguez v. Nishiki*, 65 Haw. 430, 438-39, 653 P.2d 1145, 1150-51 (1982)).

Defendants maintain that there is no genuine issue of material fact for trial because Plaintiff cannot demonstrate the first element by a preponderance of the evidence or the third element with convincing clarity.  The court examines each element below.

### a.    A false or defamatory statement

Plaintiff singles out twenty-five separate passages in the Magazine that he alleges constitute false or defamatory statements in addition to claiming that the Magazine as a whole generally defames him.  *See* Defs.' Mot. Exs. F, G; Am. Compl. ¶¶ 21-36.  Defendants examine each individual allegedly defamatory passage and argue that Plaintiff's defamation and defamation-based claims fail as a matter of law because neither the Article nor the Liner Notes contain any false or defamatory statements.  *See* Defs.' Mot. in Supp. 15-30.  For the foregoing reasons, the court agrees in part.

### i.    A defamatory statement must imply an objective fact to be actionable as defamation

The First Amendment protects "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual."  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988)).  Thus, the threshold question in defamation suits is "whether a reasonable factfinder could conclude that the statement impl[ies] an assertion of

20

objective fact." *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990) (quotation and citation signals omitted); *Milkovich*, 497 U.S. at 21 (noting that the "dispositive question" is whether a "reasonable factfinder" could conclude the alleged defamatory statements imply an assertion of fact).

   To determine whether a statement implies an assertion of objective fact -- such that the statement can be found "false and defamatory" under the First Amendment and the Hawaii Constitution -- Hawaii has adopted the Ninth Circuit's three part test which asks: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact[;] (2) whether the defendant used figurative or hyperbolic language that negates that impression[;] and (3) whether the statement in question is susceptible of being proved true or false." *Gold v. Harrison*, 88 Haw. 94, 101, 962 P.2d 353, 360 (1998) (citing *Fasi v. Gannett Co.*, 930 F. Supp. 1403, 1409 (D. Haw. 1995) (emphasis removed).

   In examining whether a plaintiff has identified a false or defamatory statement, "'the law does not dwell on isolated passages, but judges . . . the publication as a whole.'" *See Fernandes v. Tenbruggencate*, 65 Haw. 226, 230, 649 P.2d 1144, 1148 (1982) (per curiam) (quoting *Kahanamoku v. Advertiser Publ'g Co.*, 25 Haw. 701, 714, 120 WL 832, at *7 (Haw. Terr. Dec. 22, 1920)); *Miracle v. New Yorker Magazine*, 190 F. Supp. 2d 1192, 1199 (D. Haw. 2001).

All that is said on a single subject is considered together.  *See id.*

### 1.     General tenor of the Magazine

First, the court looks to the "broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work."  *See Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995); *Gold*, 88 Haw. at 101, 962 P.2d at 360.  Where the general context of the work implies that the reader would expect the work "to contain the author's personal and subjective views," the First Amendment gives the author latitude in describing the events involved.  *See Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995); *see also Fasi*, 930 F. Supp. at 1409.  Further, statements that alone may be "sufficiently factual to be susceptible of being proved true or false" may not imply objective facts in certain contexts.  *See Knievel v. ESPN*, 393 F.3d 1068, 1077-78 (9th Cir. 2005) (finding overwhelming presence of slang and non-literal language negated impression that extreme sports web page implied objective fact).  However, "[e]ven in contexts in which the general tenor of the work suggests the author is expressing personal opinions, it is possible that a particular statement . . . may imply a false assertion of objective fact[.]"  *Partington*, 56 F.3d at 1155.

*The Journal* is a small, yet distinguished, surfing publication with a primary readership of surfers.  *See* Pezman Aug. 28 Decl. ¶ 4; Pl.'s Opp'n Ex. 9.

22

The Article was written as a first-hand, narrative account of Johnson's experience purchasing a surf board from Plaintiff.  *See* Johnson Decl. ¶ 6.  The Liner Notes include Pezman's recollections of Plaintiff as well as what appear to be direct quotes of two fellow-surfers, described as Plaintiff's "cohorts."  *See* Defs.' Mot. Ex. D at D114; Pezman Aug. 28 Decl. ¶ 6; Pezman Oct. 3 Decl. ¶¶ 2-5.  Neither the Article nor the Liner Notes are fiction or parody.[13]  *See* Johnson Decl. ¶ 7; Pezman Aug. 28 Decl ¶ 6; Pezman Oct. 3 Decl. ¶¶ 2-5.  While to some extent readers would expect the Article and Liner Notes to express Johnson and Pezman's subjective views of Plaintiff, the use of narrative does not negate that the general tenor of Magazine is non-fiction, which could appear to the average *Journal* reader to portray an accurate (albeit somewhat subjective) portrait of Plaintiff.  *See Partington*, 56 F.3d at 1155.

 2. Statements that do *not* imply objective facts

 Where figurative language and hyperbole do not imply objective facts, such statements are not actionable as defamation.  *See Gold*, 88 Haw. at 103, 962 P.2d at 362 (finding rhetorical hyperbole protected by the First Amendment and incapable of being subject to defamation); *see also Milkovich*, 497 U.S. at 20 (noting First Amendment protects "imaginative expression" and "rhetorical

---

[13]  Nor is the *The Journal* a magazine associated with parody.  *See* Pl.'s Reply Ex. 10.

hyperbole"); *Partington*, 56 F.3d at 1157 (stating "rhetorical hyperbole" and

"imaginative expression" enlivens writers' prose and is protected by the First

Amendment).  For example, *Old Dominion Branch Number 496, National Assoc.*

*of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 284-85 (1974), found that a

union newsletter calling plaintiffs who worked during a strike "traitors" was not

libelous because the word was used in a "loose, figurative sense to demonstrate the

union's strong disagreement" such that it was "impossible to believe any reader

. . . would have understood the newsletter to be charging the [workers] with

committing the criminal offense of treason."  418 U.S. at 284-85; *see, e.g.*,

*Greenbelt Coop. Publ'g Ass'n v. Bressler*, 398 U.S. 6, 13-14 (1970) (holding that

word "blackmail" was "no more than rhetorical hyperbole" that not even a careless

reader would understand literally, and therefore, was an improper basis of libel

judgment); *Fasi*, 930 F. Supp. at 1410 (stating use of "Blackmail Incorporated,"

"Frank 'The Extortionist' Fasi," and "legalized blackmail" was "rhetorical

hyperbole" and "imaginative expression" not subject to defamation law); *Miracle*,

190 F. Supp. 2d at 1200-01 (asserting that plaintiff was "nuts" was "an expression

of pure opinion couched in 'figurative or hyperbolic language'" and was not

defamatory); *Sagan v. Apple Computer, Inc.*, 874 F. Supp. 1072, 1075-76 (C.D.

Cal. 1994) (dismissing libel action because no reasonable factfinder could

24

conclude that "Butt-Head Astronomer" implied the fact that plaintiff was a less than able astronomer).

Because no reasonable reader could find that the following figurative statements in the Magazine imply objective facts, they are not actionable as defamation as a matter of law: (1) "Owl is a survivor on his own planet;" (2) "Owl droppings;" (3) the references to Burroughs and his literary works; (4) the description of Plaintiff's shaping room as "*Naked Lunch* meets *Through the Looking Glass*[;]" (5) reference to Plaintiff as "a haunting presence;" "Owl eyes;" and that "Owl was always a soul-monster[;]" and (6) reference to Plaintiff as an "extreme soul surfer," "hardened into a country fixture," and one of the "few iconoclast holdouts [that] still survive beyond the fringes of our e-commerce zones." *See* Defs.' Mot. Ex. D.

Additionally, the statements in the Magazine not capable of being proved true or false are not actionable as defamation. *See Gold*, 88 Haw. at 101, 962 P.2d at 360. Specifically, Johnson's and Pezman's personal assessments, criticisms, and pure personal opinions -- those "that do not imply facts capable of being proven true or false" -- are protected by the First Amendment.[14]  *See*

---

[14] While "[a] statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' . . . if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in

(continued...)

*Miracle*, 190 F. Supp. 2d at 1198; *see, e.g.*, *Partington*, 56 F.3d at 1157-58 (finding critiques of a lawyer's performance are subjective statements not susceptible to being proven true or false); *Underwager*, 69 F.3d at 367 (noting that statements reflecting opinions of plaintiff's motivations and personality are not capable of verification); *see also Moldea v. New York Times Co.*, 22 F.3d 310, 314-16 (D.C. Cir. 1994) (holding that criticisms of a journalist's "sloppy journalism" and unprofessional techniques are not actionable under *Milkovich* because "[r]easonable minds can and do differ as to how to interpret a literary work"); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union*, 39 F.3d 191, 196 (8th Cir. 1994) ("'Unfair' is a term requiring a subjective determination and is therefore incapable of factual proof.").

Specifically, the following statements are not capable of being verified as true or false and, therefore, are not actionable as defamation: (1) "Owl is a survivor on his own planet;" (2) reference to Plaintiff's "nasal condescending voice;" (3) "[Plaintiff's] got a lot of time;" (4) "[Plaintiff's] boards are the same now as they were 20 years ago;" (5) "The first rule of backyard board orders is that you never, NEVER pay up front;" (6) the comparison of Plaintiff to Burroughs, his

---

[14](...continued)
possession of objectively verifiable facts, the statement is not actionable." *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995) (quoting *Haynes v. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993).

literary works, and *Through the Looking Glass*;[15] (7) Johnson's description of

Plaintiff's shaping room; and (8) "the rails [of the surfboard] seemed way too

hard. . . .  Hard rails catch chop in big waves," reference to the surfboard as "not

perfect," and "[Plaintiff's] been there for 40 years stuck in a time capsule.  Things

don't change there; it's like living in a Hawaiian time warp."

Accordingly, the court GRANTS Defendants' Motion for Summary

Judgment on Plaintiff's defamation and defamation-based claims as to these

statements.

### 3.      Statements that imply objective facts

The use of narrative, figurative language, and inclusion of opinion in

the Magazine, however, does not render all of its statements inactionable.  *See*

*Unelko*, 912 F.2d at 1054-55.

The Article as a whole -- while a personal, narrative account fraught

with descriptive, figurative language -- generally implies that (1) Johnson ordered

a surfboard from Plaintiff and (2) Plaintiff failed to deliver the surfboard on time as

promised, took Johnson's money up front and then deliberately avoided him for

approximately two months, and failed to craft the surfboard to Johnson's

---

[15]  Further, to the extent Plaintiff maintains that the references to Burroughs and his literary works imply that Plaintiff is a murderer or a "sexual deviant," *see* Pl.'s Mot. in Supp. 13, 22; Defs.' Mot. Ex. F at 10-15, 30-38, 53-59, that argument is far too attenuated to support his claims.  *See Chapman*, 528 F. Supp. 2d at 1096-98.

specifications.  For example, the following passages in the Article state: "I blew it. I'm sure the money I had given [Plaintiff] was gone that first day.  Now he'll feel like he's working for free. . . .  The door to his shaping room is always locked[,]" Defs.' Mot. Ex. D at D111; "I finally gave up and stopped looking.  Back to square one.  It had been almost two months since I gave money to Owl[,]" *id*. at D112; "The first swell of the season had come and gone, and I didn't have a board for Waimea[,]" *id*. at D111; and "Owl didn't round the edges off like I asked him to." *Id*. at D113.[16]  The Article also implies the fact that Plaintiff got into a physical and verbal fight with Ken Bradshaw at Sunset Beach sometime in the mid-1990s.  *Id*. at D111.

Additionally, the Liner Notes infer objective facts -- namely that Plaintiff drops in on other surfers and has a substance abuse problem.  Within Baxter and Fletcher's quotes, the Liner Notes make two references to Plaintiff's predilection for dropping in on other surfers because he was "so blind" or "couldn't see," which "sometimes caused bad energy in the water."  *See id*. at D114.  Additionally, Pezman quotes Baxter regarding Plaintiff's sobriety -- "I

---

[16]  While the Article's individual references to Burroughs do not imply objective facts, to the extent those references -- as part of the Article as a whole -- imply that Plaintiff alluded to Johnson after he ordered a board from him (for example, by referring to him as *El Hombre Invisible*!" after he mysteriously disappeared into Foodland, *see* Defs.' Mot. Ex. D at D111), they remain part of Plaintiff's defamation claim.

heard [Plaintiff's] been sober for the last year.  One year out of 40?  ([L]aughing[.]) That's good!  And I know firsthand."  *See id.*

Defendants' argument that the statement regarding Plaintiff's sobriety is not actionable because it does not imply an objective fact misstates the facts and misinterprets the law.  *See* Defs.' Mot. in Supp. 19, 22, 26.  First, Plaintiff incorrectly states that the Magazine's "free-spirited, entertaining style" -- like in *Knievel* -- negates the impression that the Liner Notes imply objective facts.  *See id.* 18-19.  Unlike *Knievel*'s extreme sports web page laced with slang and non-literal language, however, the Liner Notes -- including what appear to be verbatim quotes from two surfers, *see* Pl.'s Opp'n Ex. 9 -- may imply objective facts about Plaintiff to an average *Journal* reader.  *See Knievel*, 393 F.3d at 1077-78.  Further, even where the general tenor of a work is humorous and satirical, defamation still may lie where -- as here -- the specific statement could reasonably be viewed as an assertion of objective fact.  *See Unelko*, 912 F.2d at 1054-55 (finding statement "It didn't work" made during Andy Rooney's satirical broadcast could reasonably be viewed as asserting an objective fact).

Defendants' contention that the sobriety comment is not actionable as defamation because it is rhetorical hyperbole is also unavailing.  Defs.' Mot. in Supp. 22; Defs.' Reply 11.  Unlike the statements in *Gold* where "[e]ven the most

casual reader would understand that [people] . . . were not actually raping Harrison" or in *National Association of Letter Carriers* where the words were "obviously used . . . in a loose, figurative sense," the statement that Plaintiff has only been sober for one year out of forty is not so non-literal or obviously "loose" and "figurative" that no one could reasonably believe it to be true.  *See Gold*, 88 Haw. at 102, 962 P.2d at 361; *Nat'l Ass'n of Letter Carriers*, 418 U.S. at 284.  To the contrary, a reasonable reader could find that the statement implies exactly that Plaintiff has only been sober for one out of the last forty years.[17]

Defendants' argument that references to Plaintiff dropping in on other surfers in the Liner Notes is an example of rhetorical hyperbole also fails.  In the Liner Notes, Baxter is quoted as stating that "[Plaintiff] dropped in on everybody out there" and Fletcher is quoted as stating that "[Plaintiff] ran over Walter Hoffman right in front of [him] at Sunset he was so blind."  Defs.' Mot. Ex. D at D114.  *The Encyclopedia of Surfing* defines dropping in as "[t]he act of taking off on a wave in front of another surfer who is closer to the curl, and thus thought of as having first claim to the wave; an intentional drop-in is generally regarded as

---

[17]  Further, Defendants' claim that the statement regarding Plaintiff's sobriety is not capable of being proved true or false because it is simply "jest" or "opinion" is utterly meritless.  *See* Defs.' Reply 12.  There is no indication in the Liner Notes that the statement regarding Plaintiff's sobriety over the last forty years is either jest or opinion.  Rather, the statement is followed with -- "[a]nd I know firsthand" -- indicating that Baxter is making a factual statement about Plaintiff's sobriety (or lack thereof).  *See* Defs.' Mot. Ex. D at D114.

nothing less than wave theft[.]"  Pl.'s Opp'n Ex. 5.[18]  Contrary to Defendants'

conclusory assertion, there is nothing figurative or imaginative about this passage.

Because a reasonable reader could certainly conclude that the Liner Notes imply

the assertion that Plaintiff -- a surfer -- actually dropped in on other surfers, these

statements are subject to the law of defamation.

Accordingly, the court finds that the following statements imply

objective facts subject to a defamation action: (1) references to Johnson's

experience ordering a surfboard from Plaintiff, including Plaintiff failing to deliver

the surfboard on time, deliberately avoiding Johnson, and refusing to craft the

surfboard to Johnson's specifications; (2) Mike Hart's quote referring to Plaintiff's

altercation with Ken Bradshaw at Sunset Beach sometime in the mid-1990s; (3)

references to Plaintiff dropping in on other surfers including, "[Plaintiff] ran over

Walter Hoffman right in front of [Fletcher] at Sunset he was so blind," and "He'd

just drop in and go for it, which sometimes caused bad energy in the water because

he couldn't see you.  You'd already be in the spot, and he'd drop right in front of

you and you'd yell, 'Owl! Owl!' And he'd look back at you startled, like he didn't

know you were there . . . but, you know, he knew you were there.  (Laughing[.])

_____

[18]  Further, Plaintiff complains that the Liner Notes imply that he *literally* dropped in on
other surfers, which Plaintiff affirmatively denies.  *See Chapman* Decl. ¶¶ 4, 15-16.

At least he spread it around equally.  I mean he dropped in on everyone out there[;]" and (4) "I heard [Plaintiff's] been sober for the last year.  One year out of 40?  ([L]aughing[.])  That's good!  And I know firsthand."

    ii.  A statement must be reasonably susceptible to Plaintiff's defamatory meaning to be actionable as defamation

    Even if a statement implies an objectionable fact under the three-part test, the statement must also be "[]capable of bearing the defamatory meaning ascribed to it by the [plaintiff]" to be actionable as defamation.  *See Fernandes*, 65 Haw. at 228, 649 P.2d at 1147.  "Where the court finds that the statements are not susceptible to the meaning ascribed to it by plaintiff, the case should not be sent to the jury."  *Id.* at 228 n.1, 649 P.2d at 1147 n.1 (affirming summary judgment on defamation claim where article read as a whole was incapable of supporting plaintiff's defamatory inference) (citation signal omitted); *see also Norse v. Henry Holt & Co.*, 991 F.2d 563, 567 (9th Cir. 1993) (finding no libel where statement was not capable of the defamatory meaning ascribed by plaintiff).  A statement has a defamatory meaning "when it tends to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him."  *Beamer*, 66 Haw. at 580, 670 P.2d at 1271 (citation and quotation signals omitted); *Fernandes,* 65 Haw. at 228, 649 P.2d at 1147.

    The following two alleged defamatory statements are not actionable

because they are not reasonably susceptible to the defamatory meaning ascribed by Plaintiff: (1) "A good single-fin gun is hard to find.  And the guys who shape them are either dead, too drunk, or living in some dusty trailer on the outskirts of Cabo," Defs.' Mot. Ex. D at D107; and (2) "At Sunset one day while paddling out the channel, I saw Owl drop in to a beautifully groomed west peak; arms stretched out like a condor, he was wearing his red spring suit, and riding that giant red board. Two guys were behind him but were quickly engulfed by a wall of whitewater." *Id.* at D111.

Plaintiff argues that the first statement regarding shapers of a "good single-fin gun" defames him because it implies that he is one of those dead, drunk shapers living in Cabo.  *See* Defs.' Mot. Ex. F at 21-22.  When read as a whole, however, it is clear that this reference is meant to set Plaintiff apart from these long forgotten, used-up shapers.  After this alleged defamatory statement, the Article continues,

> I wanted [a single-fin board] but was at a loss for names.  I talked to Jeff Bushman about it and without hesitation he mentioned Owl.
> "Owl," Jeff said, "has never strayed from what he believes.  His boards are the same now as they were 20 years ago. . . .  You know, the wave at Sunset has never changed, so why should he? *The guy is one of my biggest heroes*."

Defs.' Mot. Ex. D at D107 (emphasis added).  Read together, this section features

33

Plaintiff positively -- as one of the last single-fin shapers that has remained true to
what he believes, one of Bushman's "biggest heroes." *See id.* Because this
statement is not capable of the meaning ascribed by Plaintiff, this statement is not
defamatory as a matter of law.

Plaintiff also unpersuasively argues that the second statement defamed
him by stating he dropped in on two other surfers, causing them to wipe out, which
"plainly denigrates" him for violating widely accepted surfing etiquette. *See* Defs.'
Mot. Ex. F at 51-52. Plaintiff, however, misreads this passage -- Johnson clearly
states that Owl dropped into a *wave* ("a beautifully groomed west peak") and does
not infer that Plaintiff caused the other surfers to wipe out. *See id.* Quite the
contrary, Johnson alludes that Plaintiff graciously gave the wave to the surfers.
The Article continues, "I thought of the quote he had in *Surfer's: The Movie*. He
said, 'Give a wave, make a friend. You never know, he might have a good-looking
sister.'" *Id.* This statement, therefore, is not defamatory as a matter of law.

Because neither of these statements are reasonably susceptible to the
defamatory meaning Plaintiff asserts, the court GRANTS Defendants' Motion for
Summary Judgment on Plaintiff's defamation and defamation-based claims as to
these two statements.

iii.   Plaintiff's quotations not capable of defamatory meaning
are not actionable as defamation

Unlike statements made by the author or quotations attributed to

others, under *Masson v. New York Magazine, Inc.*, 501 U.S. 496 (1991), quotations

falsely attributed to Plaintiff are actionable as defamation regardless of the truth or

falsity of the substance of the quotation so long as the quote injures Plaintiff's

reputation.  *See Masson*, 501 U.S. at 511-12.  A false quotation may injure

Plaintiff's reputation by either "attribut[ing] an untrue factual assertion" to him --

for example a self-condemnatory fact -- or by portraying a "manner of expression

. . . or an attitude the [Plaintiff] does not hold."  *See id.* at 511.  For example, where

a plaintiff was quoted as calling himself "the greatest analyst who ever lived,"

*Masson* found that "one need not determine whether [he] is or is not . . . in order to

determine that it might have injured his reputation to be reported as having so

proclaimed."  *Id.* at 511-12 (noting that had Beatle member John Lennon been

falsely quoted for saying "We're more popular than Jesus Christ now" he could

have brought an action for defamation).

The Article includes the following four quotes attributed to Plaintiff:

(1) "Hey, kid . . .  You need a new board -- a real board[,]" and "Psst.  Hey, kid,

what happened there?  Ah, Sunset can be a bitch to boards.  That looks bad, man.

Looks like you need a new one" in the context of soliciting buyers at Sunset beach,

35

Defs.' Mot. Ex. D at D105; (2) "Okay. . . .  What do you want here? . . .  First, tell me what you think you want, and I'll tell you want you need[,]" *id.* at D109; (3) "Yeah, money.  I need a deposit.  I don't work for free[,]" *id.*; and (4) "I'll tell you what, . . . guys will be runnin' from you on this thing.  Guys like Slater will be scratching just to get out of your way -- Slater!  Why does that little fucker even come here?"  *Id*.  According to Chapman, all of these quotations are false.  *See* Chapman Oct. 3 Decl. ¶ 2; Chapman Sept. 9 Decl. ¶ 10

The first three quotes, *even if fabricated*, do not attribute any factual assertions to Plaintiff, portray him in a negative light, or attribute a negative manner of expression to him, and, therefore, are not capable of defamatory meaning as a matter of law.  *See Masson*, 501 U.S. at 511-12; *see also Fernandes*, 65 Haw. at 228-30, 649 P.2d at 1147-49.  The court, thus, GRANTS Defendants' Motion for Summary Judgment on Plaintiff's defamation and defamation-based claims as to these three statements.

Assuming the fourth quote was fabricated, however, the court cannot unequivocally find that attributing a quote to Plaintiff calling Kelly Slater -- a record-breaking six-time 1990s world surf champion, *see* Pl.'s Opp'n Ex. 8 -- a "little fucker" would not injure his reputation as a surfer or surfboard shaper as a

36

matter of law.[19]  In other words, a genuine material issue remains as to whether

falsely attributing this statement to Plaintiff -- asking "why does that little fucker

[Slater] even come here?" -- in *The Journal* could have harmed Plaintiff's

reputation as to lower him in the estimation of the community or deterred people

from dealing with him.  *See Beamer*, 66 Haw. at 580, 670 P.2d at 1271; *see also*

*Masson*, 501 U.S. at 497 ("A fabricated quotation may injure reputation . . . by

indicating . . . an attitude the speaker does not hold.").

Accordingly, the court DENIES Defendants' Motion for Summary

Judgment as to this statement.

b.      *Actual malice*

Defendants also argue that they must prevail because Plaintiff cannot

establish that any of the Defendants acted with actual malice.  The court agrees as

to Debbee Pezman, Milnor, Hulet, and Divine (collectively, "non-author

Defendants"), but finds that Plaintiff has raised a genuine material issue as to

whether Defendants Johnson and Pezman (collectively, "author Defendants") acted

---

[19]  Because Plaintiff denies uttering the Slater quote and Johnson asserts that Plaintiff made the statement, there is also a genuine material issue as to actual malice (*i.e.*, whether Johnson materially misquoted plaintiff) with regard to this statement.  *Masson v. New York Magazine, Inc.*, 501 U.S. 496, 518 (1991) (holding that "a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of [*New York Times Co.*] unless the alteration results in a material change in the meaning conveyed by the statement").  This statement, therefore, survives summary judgment as to Johnson.

with actual malice.[20]

        i.     Legal framework: actual malice

Because Plaintiff is a public figure, he must show by clear and convincing evidence that Defendants acted with "'actual malice' -- that is, with knowledge that [the statement] was false or with reckless disregard of whether it was false or not" -- in order to survive summary judgment.  *New York Times*, 376 U.S. at 279-80; *see also Anderson*, 477 U.S. at 255-56 (stating appropriate summary judgment question in public figure defamation case is "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that plaintiff has not"); *Tagawa v. Maui Publ'g Co.*, 50 Haw. 648, 652, 448 P.2d 337, 340 (1968) ("'Actual malice' consists of 'deliberate falsification' of facts or 'reckless disregard' of the truth, *i.e.*, reckless publication despite a high degree of awareness . . . of the probable falsity of the published statements.").  "Actual malice is a subjective standard that turns on the defendant's state of mind[.]"  *Flowers v. Carville*, 310 F.3d 1118, 1131 (9th Cir. 2002); *see also Fong v. Merena*, 66 Haw.

---

[20] Because there is a genuine issue of material fact as to whether Pezman, publisher of *The Journal*, acted with actual malice as to the Liner Notes, there is also a genuine issue of material fact as to whether the *The Journal* acted with actual malice.  *See Rodriguez v. Nishiki*, 65 Haw. 430, 436, 653 P.2d 1145, 1149 (1982) (noting that plaintiff "must prove that the publisher of the defamatory statement acted with knowledge of its falsity or reckless disregard of its truth" to proceed against publishing company).

72, 74, 655 P.2d 875, 877 (1982) (reversing judgment of defamation where defendant subjectively believed statement was accurate).

"An investigatory failure alone . . . , without a high degree of awareness of probable falsity may raise the issue of negligence but not the issue of 'actual malice.'" *Tagawa*, 50 Haw. at 652, 448 P.2d at 340; *Fong*, 66 Haw. at 74, 655 P.2d at 876-77 (noting that "mere investigatory failure [will not] provide sufficient support for a finding of malice"); *see also St. Amant v. Thompson*, 390 U.S. 727, 733 (1968) ("Failure to investigate does not in itself establish bad faith."); *New York Times*, 376 U.S. at 287-88 (finding no actual malice for investigatory failure where *Times* employees disclaimed any knowledge of falsity in sworn testimony); *D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1283 (C.D. Cal. 2000) (noting "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard for the truth").  *St. Amant* reversed a state court's finding of actual malice where a sheriff made a statement without personal knowledge, relied on an affiant of unknown veracity, and failed to verify the information because nothing in the record indicated that the sheriff was aware of the probable falsity of the statement.  *See St. Amant*, 390 U.S. at 730-33.  "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious

doubts as to the truth of his publication . . . [to] show[] reckless disregard for the truth or falsity and demonstrate[] actual malice." *Id.* at 731; *see also Tawaga*, 50 Haw. at 654, 448 P.2d at 341-42.  Otherwise, no actual malice lies for "a mere investigatory failure" even where "a simple telephone call by [the author] or [editor]" to the plaintiff would have uncovered the truth.  *See Tawaga,* 50 Haw. at 654, 448 P.2d at 341-42.

           ii.     Application of actual malice standard to author Defendants

Because Plaintiff provides evidence that the author Defendants knew that the statements in the Article (as to Johnson) and Liner Notes (as to Pezman) were false, there is a genuine issue of material fact as to whether they acted with actual malice.

Specifically, although Johnson adamantly maintains that the Article accurately depicts actual events, *see* Johnson Decl. ¶ 7; Defs.' Mot. Ex. I at 4, Plaintiff claims that he never sold a surfboard to Johnson, thereby rendering the entire article false.  *See* Chapman Oct. 3 Decl. ¶¶ 2, 3.  Because a reasonable fact finder could choose to believe either Plaintiff or Johnson, a genuine issue of material fact exists for trial.  *See Tagawa*, 50 Haw. at 656, 448 P.2d at 342 (noting if the author's column was "purely a figment of [the author's] imagination, then the issue of 'actual malice' would have arisen, summary judgment for defendant would

have been denied and the case would have been tried").  Defendants' argument that Plaintiff's Declaration denying Johnson purchased a surfboard from him "fails to establish anything about Johnson's state of mind" defies logic.  *See* Defs.' Supp. Opp'n 4.  By declaring that the facts in Johnson's Article never occurred, Plaintiff has provided evidence that Johnson fabricated the story -- *i.e.*, evidence that Johnson subjectively knew the Article was false.  *See Tagawa*, 50 Haw. at 656, 448 P.2d at 342.

    Plaintiff also raises a genuine issue of fact for trial regarding the authenticity of the Baxter and Fletcher interviews.  Based upon the audiotape of the interviews, Plaintiff claims that Pezman fabricated the quotations in the Liner Notes and tape-recorded Baxter and Fletcher *after* publication of the Magazine -- "Pezman did not rely on any 'interview' when he wrote this malicious article; he obviously fabricated 'quotes' and interlineated them with his own scurrilous commentary[.]"  *See* Pl.'s Reply 17; *see also id.* 7-8; Pl.'s Opp'n 17.[21]  To support this allegation, Plaintiff relies on the following portion of the audiotape of the

---

    [21]  Defendants argue that the professional transcript should be stricken pursuant to Federal Rule of Civil Procedure 37(c) because it is an untimely expert report.  *See* Defs.' Reply 5-6; Defs.' Opp'n 22.  Because Defendants and Plaintiff have also provided the court with copies of the audiotape, which the court has reviewed and cited herein, *see* Defs.' Reply Ex. K, this objection is without merit.
    The court need not address the admissibility of the two-page report prepared by the Audio Forensic Center, *see* Pl.'s Opp'n Ex. 2, because the court does not consider the report in reaching its conclusions.

Baxter interview suggesting the interview occurred in 2007, after publication of the

Liner Notes:

| | |
|---|---|
| Pezman: | How long it's been since you seen [Owl]?  A long time now. |
| Baxter: | Long time. |
| Pezman: | Yeah. |
| Baxter: | Long time. |
| Pezman: | He doesn't come over here too much. |
| Baxter: | He never comes over here.  His brother comes here, Ahh, but ahh ... |
| Pezman: | But, ahh, how did Owl just got hung up in a time warp on the North Shore and never left it. |
| Baxter: | For thirty seven years now, My son Josh was born, 1970 |
| Pezman: | [Forty][22] years. |
| Baxter: | So, ahh . . . he could have been there ... |
| Pezman: | For forty years.  He's been over there for [thirty] years. |
| Baxter: | [Thirty] years.  I guess that's what it is.  But he's been there in this, capsule.  And, |
| Pezman: | Doing the same thing . . . |

Defs.' Reply Ex. K; *see also* Pl.'s Mot. Ex. 1 at 12-13.  Pezman, on the other hand,

maintains that the audiotape captures a valid, pre-publication interview.  Pezman

Oct. 3 Decl. ¶¶ 2-5.

While far from definitive, given that Baxter stated that he had not seen

Plaintiff since 1970 (thirty-seven years earlier), a reasonable person could conclude

---

[22]  The words in brackets are the court's best estimate as to what was said -- specifically, it is not clear whether Pezman or Baxter say "thirty" or "forty."

that the interview took place in 2007 -- the year after the publication of the Liner Notes.  There is, therefore, a genuine material issue for trial as to whether Pezman acted with actual malice.

Because Plaintiff has presented clear and convincing evidence upon which a reasonable factfinder could find that author Defendants knew that the statements in the Article and Liner Notes were false, there is a genuine material issue for trial as to whether Pezman and Johnson acted with actual malice.  As to the statements that imply an objective fact and are capable of defamatory meaning, therefore, the court DENIES Defendants' Motion for Summary Judgment on the defamation and defamation-based claims as to Johnson with regard to the Article and Pezman and *The Journal* with regard to the Liner Notes.

iii.   Application of actual malice standard to non-author Defendants

Defendants argue that the record establishes that the non-author Defendants did not act with actual malice.  The court agrees.  Specifically, after Defendants met their initial burden, Plaintiff has not provided *any* evidence that non-author Defendants either knew the Magazine contained false statements or subjectively "entertained serious doubts as to the truth" of those statements.  *See St. Amant*, 390 U.S. at 731.

While Plaintiff asserts that Johnson fabricated the Article, the record

43

wholly lacks any evidence that non-author Defendants had any indication that the story underlying the Article may be false.  Most of the Article contains Johnson's first person account of his interactions with Plaintiff, which he presented to the other Defendants as true.  *See* Pl.'s Opp'n Exs. 3, 19 at 3; Johnson Decl. ¶ 6. Johnson also asserted that he verified the quotes in the Article.  *See* Pl.'s Opp'n Exs. 3 at D61, 18 at 9; Johnson Decl. ¶ 6.  Further, Johnson previously wrote a successful Article for *The Journal*.  *See* Hulet Decl. ¶ 2.  Plaintiff has put forth no evidence to indicate that non-author Defendants had reason to doubt the truth of the Article or Johnson.  As to the Liner Notes, the record lacks any evidence that anyone other than Pezman had any role in the interviews or any knowledge of their potential fabrication.  Because the record is wholly devoid of any evidence that non-author Defendants harbored *any* awareness of falsity of the statements in the Magazine, a reasonable jury could not support a finding that Plaintiff has shown actual malice by clear and convincing as to these Defendants.  *See St. Amant*, 390 U.S. at 731; *Tagawa*, 50 Haw. at 652, 448 P.2d at 340; *see also Anderson*, 477 U.S. at 255-56.

Contrary to Plaintiff's contention, *see* Pl.'s Opp'n 38, 41, without "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *see St. Amant*, 390 U.S. at 731, --

which Plaintiff has not demonstrated -- non-author Defendants' failure to verify the facts within the Magazine with Plaintiff prior to publication does not rise to the level of reckless disregard. *See New York Times*, 376 U.S. at 287-88 (finding no actual malice for printing statement that certain prominent persons had sponsored critical advertisement where a call to any of the alleged sponsors would have revealed that their names were used without permission); *Tawaga*, 50 Haw. at 654, 448 P.2d at 341 (finding no actual malice for "a mere investigatory failure" where "a simple telephone call by [the author] or [editor]" to the subjects of the work would have uncovered the truth).[23]

Finally, where Plaintiff has put forth no evidence that non-author Defendants subjectively entertained any doubts as to the truth of the statements or had any knowledge of falsity, whether non-author Defendants violated standards of responsible and ethical journalism is immaterial. *See St. Amant*, 390 U.S. at 731; *Tagawa*, 50 Haw. at 652, 448 P.2d at 340; *see also New York Times*, 376 U.S. at 287-88; *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 669 (9th Cir. 1990) ("Even an

---

[23] While the Article and Liner Notes reference Plaintiff's bizarre behavior and potential drug use, prior surfing publications have called Plaintiff "the man time forgot," Defs.' Reply Ex. Q at D517, involved with "the odd psychedelic something," Defs.' Reply Ex. M at D536, "really crazed," Defs.' Reply Ex. N at D523, and teetering on "the fine line between profound philosopher and space cadet[,]" Defs.' Reply Ex. Q at D517, and have also repeatedly referred to Plaintiff's drug use. *See* Defs.' Reply Exs. M, N, O, P. Thus, nothing in the Article or Liner Notes was "so inherently improbable that only a reckless man would have put [the Magazine] in circulation." *See St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing.  Only the existence of sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of . . . probable falsity will suffice to meet the subjective test." (citation and quotation signals omitted)).

Because Plaintiff has failed to demonstrate actual malice as to non-author Defendants, the court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's defamation claim (Count I) as to Debbee Pezman, Hulet, Milnor, and Divine.

### c. Identifying Plaintiff's defamation-based claims

Because the "actual malice" standard applies to defamation and defamation-based claims, tort claims which are found to be artfully pled defamation claims are disallowed where the defamation claims themselves are invalid as a matter of law.  *See Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1193 n.2 (9th Cir. 1989); *Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 893 n.4 (9th Cir. 1988); *Gold*, 88 Haw. at 103, 962 P.2d at 362.  As such, a plaintiff cannot maintain a separate cause of action for emotional distress, false light, disparagement of trade, or tortious interference with business where the gravamen of his claim is

46

defamation.  *See Dworkin*, 867 F.2d at 1193 n.2 (noting that an "emotional distress

claim based on the same facts as an unsuccessful libel claim cannot survive as an

independent cause of action" (quotation and citation signals omitted)); *Gold*, 88

Haw. at 103, 962 P.2d at 362 (dismissing plaintiff's derivative claims for false

light, invasion of privacy, IIED, and negligence where court found statement was

not defamatory); *Unelko*, 912 F.2d at 1057-58 (noting derivative claims for

disparagement, "trade libel," and tortious interference with business are "subject to

the same first amendment requirements that govern actions for defamation"); *see

also Falwell*, 485 U.S. at 57 (noting when defamation claim fails because

defendant's speech is constitutionally protected, a claim for emotional distress

"cannot, consistently with the First Amendment, form a basis for the award of

damages"); *Basilius v. Honolulu Publ'g Co.*, 711 F. Supp. 548, 552-53 (D. Haw.

1989) (citing case for proposition that "First Amendment defenses are applicable to

all claims, of whatever the label, whose gravamen is the alleged injurious

falsehood").

Because the gravamen of Plaintiff's claim is defamation, Plaintiff's

claims of disparagement of trade, tortious interference with business, false light,

and emotional distress are all derivative claims that stand or fall with the

underlying defamation claim.  *See* Am. Compl. ¶¶ 37-43, 51-54, 62-71.

Accordingly, Plaintiff's derivative defamation-based claims against non-author

Defendants fail and Plaintiff's derivative defamation-based claims against author

Defendants remain.  The court, therefore, (1) GRANTS Defendants' Motion for

Summary Judgment as to counts II, IV, VII, VIII, and IX of Plaintiff's Amended

Complaint ("Plaintiff's defamation-based claims") as to Debbee Pezman, Hulet,

Milnor, and Divine and (2) DENIES Defendants' Motion for Summary Judgment

on Plaintiff's defamation-based claims as to Johnson, Pezman, and *The Journal*.

### 2.    *Plaintiff's Tortious Interference Claim*

In his fourth cause of action, Plaintiff alleges that Defendants

wrongfully, intentionally, and tortiously interfered with his business.  Two

potential torts are contained within Plaintiff's claim -- tortious interference with

existing contractual relations and tortious interference with a prospective business

advantage.  Because Plaintiff does not dispute Defendants' interpretation of his

claim as one for tortious interference with an existing contract, the court addresses

Plaintiff's claim as such.[24]

---

[24]  Even if Plaintiff does allege a claim for tortious interference with a prospective
business advantage, that claim cannot stand.  A plaintiff alleging the tort of interference with
prospective business advantage must show:

> (1) the existence of a valid business relationship or a prospective
> advantage or expectancy sufficiently definite, specific, and capable of
> acceptance in the sense that there is a reasonable probability of it maturing
> into a future economic benefit to the plaintiff; (2) knowledge of the

(continued...)

In order to establish a prima facie claim for tortious interference with

an existing contract, a plaintiff must show:

> (1) a contract between the plaintiff and a third party; (2) the
> defendant's knowledge of the contract; (3) the defendant's
> intentional inducement of the third party to breach the contract;
> (4) the absence of justification on the defendant's part; (5) the
> subsequent breach of the contract by the third party; and (6)
> damages to the plaintiff.

*Lee v. Aiu,* 85 Haw. 19, 32, 936 P.2d 655, 668 (1997) (citing *Weinberg v. Mauch,*

78 Haw. 40, 50, 890 P.2d 277, 287 (1995)).  Although not entirely clear, Plaintiff

apparently maintains that his termination from his rental arrangement "abruptly

and without warning . . . soon after the publication and circulation" of the

Magazine supports his tortious interference claim.  *See* Defs.' Mot. Ex. F at 106-

08.

While Defendants identify that Plaintiff has failed to establish the

second, third, or fifth elements of this claim, *see* Defs.' Mot. in Supp. 32, Plaintiff

does not come forward with any facts (or in any way indicate) that Defendants had

---

[24](...continued)
> relationship, advantage, or expectancy by the defendant; (3) a purposeful
> intent to interfere with the relationship, advantage, or expectancy; (4) legal
> causation between the act of interference and the impairment of the
> relationship, advantage, or expectancy; and (5) actual damages.

*Kahala v. Royal Corp. v. Goodsill Anderson Quinn & Stifel,* 113 Haw. 251, 268 n.18, 151 P.3d
732, 749 n.18 (2007).  Because Plaintiff fails to allege or show any specific facts satisfying *any*
of the necessary elements, a claim for tortious interference with prospective business advantage
fails as a matter of law.

any knowledge of his rental agreement, intended to induce Plaintiff's landlord to breach the rental agreement, or caused Plaintiff's landlord to terminate his rental agreement. Thus, Plaintiff's tortious interference claim fails as a matter of law.

The court, therefore, GRANTS Defendants' Motion for Summary Judgment on Plaintiff's claim for tortious interference.

### 3.    *Plaintiff's Unjust Enrichment Claim*

In his fifth cause of action, Plaintiff asserts a claim for unjust enrichment. The elements of an unjust enrichment claim are the "(a) receipt of a benefit without adequate legal basis by Defendants; and (b) unjust retention of that benefit at the expense of Plaintiff[ ]." *Porter v. Hu*, 116 Haw. 42, 53, 169 P.3d 994, 1005 (App. 2007) (citing *Small v. Badenhop*, 67 Haw. 626, 636, 701 P.2d 647, 654 (1985)). The "person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Badenhop*, 67 Haw. at 636, 701 P.2d at 654. "Restitution restores a person to the position he formerly occupied, either by the return of something which he formerly had or by the receipt of its equivalent in money." *Hong v. Kong*, 5 Haw. App. 174, 182, 683 P.2d 833, 841 (1984) (citation and quotation signals omitted); *see also Hu*, 116 Haw. at 54, 169 P.3d at 1006 ("Restitution . . . restores a person to the position he or she formally occupied, either by the return of something which he or she formerly had

50

or by the receipt of its equivalent in money.").

    First, although Defendants identified Plaintiff's fatal failure to demonstrate that he conveyed a benefit on them, *see* Defs.' Mot. in Supp. 32, Plaintiff does not dispute the point or come forward with any facts that Plaintiff imparted a benefit upon Defendants. *See Miracle*, 190 F. Supp. 2d at 1203 (noting that *The New Yorker's* profiting from publication of article at unsuccessful defamation at plaintiff's expense did not constitute a benefit that required restitution under Hawaii law); *see also Matsushita*, 475 U.S. at 586-87 ("When the moving party has carried its burden under Rule 56(c) its opponent must . . . come forward with specific facts showing that there is a genuine issue for trial."). Second, Plaintiff has not shown that Defendants have unjustly retained any benefit at his expense.  In other words, Plaintiff also has not provided any evidence of loss.  Where Plaintiff has not suffered a loss, his claim of unjust enrichment cannot prevail.  *See Badenhop*, 67 Haw. at 636, 701 P.2d at 654 (noting injustice underlying claim of unjust enrichment addresses "[n]ot all injustice but one special variety: the unjust enrichment of one person *at the expense of another*") (emphasis added).

    Because Plaintiff has failed to demonstrate either essential element of unjust enrichment, his claim fails as a matter of law.  Thus, the court

GRANTS Defendants' Motion for Summary Judgment on Plaintiff's unjust

enrichment claim.

## B.      Plaintiff's Motion for Summary Judgment

Plaintiff moves for partial summary judgment.[25]  For essentially the

same reasons outlined above, the court DENIES Plaintiff's Motion.

Plaintiff has failed to show that a reasonable jury could find that any

of the Defendants made defamatory statements with actual malice as a matter of

law.[26]  Because Plaintiff has failed to show Defendants acted with actual malice as

a matter of law, his Motion for Summary Judgment on his defamation and

derivative IIED claim fails.[27]

Plaintiff's argument that because Johnson cannot locate his notes or

_____

[25]  While Plaintiff styles his motion as one for summary judgment, it appears that Plaintiff only brings a motion for partial summary judgment on his claims for defamation, IIED, invasion of privacy, and misappropriation.  Because the court has already granted summary judgment on Plaintiff's claims for invasion on privacy and misappropriation in the November 7, 2007 Order, the court only addresses Plaintiff's defamation and IIED claims herein.  *See Chapman*, 528 F. Supp. 2d at 1096-99.

[26]  Also, as noted above, there is a genuine material issue for trial as to whether the *The Journal*, as a Defendant, acted with actual malice with regard to the Liner Notes.

[27]  Plaintiffs' conclusory argument that "[b]ased on . . . Defendants['] reckless and malicious conduct, Plaintiff has established sufficient facts to satisfy a claim of IIED" fails because Plaintiff has not met his summary judgment burden to show that Defendants acted recklessly or maliciously.  *See* Pl.'s Mot. in Supp. 41; *see also Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988) (stating claim for emotion distress cannot stand consistent with the First Amendment where underlying defamation claim fails); *Gold v. Harrison*, 88 Haw. 94, 103, 962 P.2d 353, 362 (1998).

the surfboard or recall the exact date of the transaction proves clearly and convincingly that he fabricated the entire Article goes entirely too far.  *See* Pl.'s Opp'n 20-21.  While this evidence supports Plaintiff's version of events, even considering these facts, a reasonable jury could still choose to believe Johnson over Plaintiff -- thereby raising a genuine issue for trial as to actual malice.

Further, Plaintiff's conclusory argument that the transcript unequivocally proves that Pezman's interview of Baxter and Fletcher occurred after publication of the Magazine at issue -- thereby demonstrating actual malice as a matter of law -- wholly lacks merit.  Pl.'s Mot. in Supp. 12, 19-21; Pl.'s Supp. Opp'n 7; Pl.'s Opp'n 17.  To the contrary, considering the audiotape's ambiguity and Pezman's claim that the audiotape captures a valid, pre-publication interview, a reasonable fact finder could certainly conclude that the interview occurred prior to publication.[28]  *See* Defs.' Reply Ex. K; *see also* Pl.'s Mot. Ex. 1 at 12-13.[29]

---

[28]  Plaintiff's statement that Johnson "admits that he destroyed material evidence" misstates facts in the record.  *See* Pl.'s Mot. in Supp. 38; Pl.'s Opp'n 44.  While Johnson admits that he "may have kept other journals in the mid-90s but currently does not have possession of such journals[,]" *see* Pl.'s Opp'n Ex. 17 ¶¶ 130-33, and states that he misplaced or threw out most of his journals *before* this lawsuit began, *see* Defs.' Mot. Ex. I at 2; Pl.'s Mot. Ex. 5a, no where in the record does Johnson admit destroying material evidence.

Therefore, Plaintiff's derivative argument -- that Defendants should be precluded from referencing Johnson's notes and diaries no longer in his possession for "failure to disclose" information pursuant to Federal Rule 37(c), *see* Pl.'s Mot. in Supp. 42-42 -- also cannot stand because Plaintiff has not shown that Defendants have failed to disclose any information.

[29]  Plaintiff also argues that Defendants engaged in fraud as to photo gathering.  *See* Pl.'s Mot. in Supp. 18.  Plaintiff has not brought a fraud claim and may not amend his Complaint to

(continued...)

The court, therefore, DENIES Plaintiff's Motion.

## V. **CONCLUSION**

As described above, in sum, the court (1) GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment and (2) DENIES Plaintiff's Motion for Summary Judgment in full.

The court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's defamation and defamation-based claims in counts I, II, IV, VII, VIII, and IX of Plaintiff's Amended Complaint as to Debbee Pezman, Milnor, Hulet, and Divine. The court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's claims of unjust enrichment and tortious interference in counts IV and V of Plaintiff's Amended Complaint as to all Defendants.

Plaintiff's defamation and defamation-based claims in counts I, II, VII, VIII, and IX of his Amended Complaint remain as to Johnson with regard to the following statements: (1) references to Johnson's experience ordering a surfboard from Plaintiff including Plaintiff failing to deliver the surfboard on time, Plaintiff deliberately avoiding Johnson, and Plaintiff failing to craft the surfboard

---

[29](...continued)
include such a claim.  On August 19, 2008, Magistrate Judge Kobayashi denied Plaintiff's Second Amended Motion for Leave to file a Second Amended Complaint to include a count of fraud.  This court, therefore, does not consider Plaintiff's fraud argument.

to Johnson's specifications; (2) Mike Hart's quote referring to Plaintiff's

altercation with Ken Bradshaw at Sunset Beach sometime in the mid-1990s; and

(3) the quote attributed to Plaintiff referring to Kelly Slater as a "little fucker."

Plaintiff's defamation and defamation-based claims in counts I, II, VII, VIII, and

IX of his Amended Complaint remain as to Pezman and *The Journal* with regard to

the following statements: (1) references to Plaintiff dropping in on other surfers

including, "[Plaintiff] ran over Walter Hoffman right in front of [Fletcher] at

Sunset he was so blind," and "He'd just drop in and go for it, which sometimes

caused bad energy in the water because he couldn't see you.  You'd already be in

the spot, and he'd drop right in front of you and you'd yell, 'Owl! Owl!' And he'd

look back at you startled, like he didn't know you were there . . . but, you know, he

knew you were there.  (Laughing[.])  At least he spread it around equally.  I mean

he dropped in on everyone out there.[;]" and (2) "I heard [Plaintiff's] been sober

///

///

///

///

///

///

55

for the last year.  One year out of 40?  ([L]aughing[.])  That's good!  And I know

firsthand."  No claims remain against Debbee Pezman, Milnor, Hulet, or Divine.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 24, 2008.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Chapman v. Journal Concepts, Inc., et al.*, Civ. No. 07-00002 JMS/LEK, Order (1) Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and (2) Denying Plaintiff's Motion for Summary Judgment